**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **DUSTIN NAPIER,**                                )                                 | |
|                                                                )                                 | |
|        *Plaintiff,*                                      )                                 | |
|                                                                )                                 | |
| v.                                                            )                                 | Civil Action No.: |
|                                                                )                                 | |
| **BOARD OF COUNTY COMMISSIONERS** ) | |
| **FOR LARIMER COUNTY,**                  ) | |
| **LARIMER COUNTY SHERIFF JUSTIN** ) | |
| **SMITH, in his individual and official**  ) | |
| **capacities, CAPTAIN TIMOTHY PALMER,** ) | |
| **JOHN DOES 1-2, LUKE ALBROOK,**    ) | |
| **KEITH MCLAUGHLIN, M.D.,**            ) | Jury Trial Requested |
| **CHARLES DAVIS, M.D., HANNAH**      ) | |
| **HOLIDAY, MICHELLE WILSON,**        ) | |
| **AND ARMOR CORRECTIONAL**          ) | |
| **HEALTH SERVICES, INC.**                  ) | |
|                                                                ) | |
|        *Defendants.*                                  ) | |

<u>**COMPLAINT**</u>

COMES NOW Plaintiff, Dustin Napier, and files this Complaint, using 42 U.S.C. § 1983 as the vehicle to vindicate his Constitutional Rights, including his Eight Amendment right to receive adequate medical care for the treatment of his serious medical needs and the right to be free from cruel and unusual punishment. Mr. Napier also seeks to vindicate his protected rights under Colorado state law, including his right to be compensated for suffering caused by the demonstrated negligence of his treating physician.

## INTRODUCTION

In the Spring of 2020, during a firearms background check, Mr. Napier found out he had a years-old outstanding warrant for a non-violent offense. Shortly thereafter, Mr. Napier was arrested and taken into custody. On March 12, 2020, Mr. Napier was booked into the Larimer County Jail on a misdemeanor. He was a first-time, non-violent offender. What should have been a routine process turned into a harrowing ordeal.

Defendants John Does 1-2, Larimer County Jail correctional officers, in violation of the Jail's own offender screening policy, failed to perform a threat assessment on either Mr. Napier or his cellmate. As a result, Mr. Napier was placed in a cell with a violent individual who had an extensive criminal record, including numerous assaults. This cellmate, Alex Tovar, brutally attacked Mr. Napier, fracturing his jaw. A correctional officer took Mr. Napier to Poudre Valley Hospital, where an emergency room physician deemed it necessary that Mr. Napier receive a surgical consult within two days.

At this point, Defendant Armor medical providers, Dr. Charles Davis, Dr. McLaughlin, Nurse Hannah Holiday, and Medical Assistant Michelle Wilson, had an obligation to (1) order Mr. Napier's off-site surgical consult and/or (2) begin, at the very least, the process necessary to ensure Mr. Napier received his off-site surgical consult. Instead, these Armor medical providers knowingly left Mr. Napier in his cell, bleeding from his mouth, in agony, unable to sleep and constantly drinking his own blood **for four days.** The Defendant Armor medical providers intentionally delayed providing care until Mr. Napier bonded out, at which point Mr. Napier went to obtain his own medical care.

Jails owe a non-delegable duty imposed by the Constitution to provide for every necessary medical care that their inmates require. However, upon information and belief, Larimer County and Armor have faced pressure to lower off-site hospitalization costs. With that in mind, when confronted by Mr. Napier's serious injury, Dr. Charles Davis, Dr. McLaughlin, Nurse Hannah Holiday, and Medical Assistant Michelle Wilson delayed Mr. Napier's surgical consult until he was released from the facility.

## JURISDICTION AND VENUE

1.

This civil rights action arises under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy as the federal law claims.

2.

Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391. All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

## PARTIES

3.

At all relevant times, Plaintiff Napier was a citizen of the United States and a resident of the State of Colorado.

4.

The Board of County Commissioners for the County of Larimer (BOCC) is the public entity responsible for Larimer County and the Larimer County Jail, for approving the County's budget, and for providing funds for the Larimer County Jail and its contracts. The BOCC is responsible for the supervision, training, official polices, customs, and actual practices of both the Larimer County Sheriff's Office and the Larimer County Jail. Under state law, a claim against a county must be asserted against the Board of County Commissioners of that county. C.R.S. Section 30–11–105.

5.

Defendant Sheriff Justin Smith is the Sherriff of Larimer County. At all times relevant to this Complaint, Defendant Smith was a citizen of the United States and a resident of the State of Colorado. At all times relevant to the claims, Defendant Smith was acting under color of state law as an official policymaker for Larimer County Jail. Mr. Napier's claims against Sheriff Smith in his official capacity are sufficient to assert governmental entity liability against the Larimer County Sheriff's Office under Section 1983.

6.

Defendant Captain Timothy Palmer is the commander of the Jail Division within the Larimer County Sheriff's Office. At all times relevant to this Complaint, Defendant Palmer was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in his capacity as the commander of the Jail

Division within the Larimer County Sheriff's Office. At all times relevant, Palmer was responsible to know all governing law with respect to his conduct towards Mr. Napier.

7.

Defendant John Does 1-2 were correctional officers employed at the Larimer County Jail. They were responsible for applying the housing Classification Policy to Alex Tovar and Mr. Napier at intake. The policy required that Defendants classify "inmates… into specific custody levels in order to provide for their welfare and the overall security of the facility." At all times relevant to this Complaint, Defendants John Does 1-2 were citizens of the United States and were residents of the State of Colorado. At all times relevant to the claims, Defendants John Does 1-2 were acting under the color of state law and Defendants John Does 1-2 were responsible for knowing and acting in accordance with all regulations of Larimer County Jail, as well as knowing all governing laws with respect to their conduct towards Mr. Napier.

8.

Defendant Luke Albrook was a correctional officer employed at the Larimer County Jail. At all times relevant to this Complaint, Defendant Albrook was a citizen of the United States and was a resident of the State of Colorado. At all times relevant to the claims, Defendant Albrook was acting under the color of state law and Defendant Albrook was responsible for knowing and acting in accordance with all regulations of Larimer County Jail, as well as knowing all governing laws with respect to their conduct towards Mr. Napier.

9.

Defendant Dr. Charles Davis was a physician employed by Armor at the Larimer County Jail. At all times relevant to this Complaint, Defendant Dr. Davis was a citizen of the United States and was a resident of the State of Colorado. At all times relevant to the claims, Dr. Davis was acting under the color of state law and Dr. Davis was responsible for knowing and acting in accordance with all regulations, policies, and procedures of both Larimer County Jail and his employer, Defendant Armor Correctional Health Services, while upholding his responsibility as the Licensed Physician or Medical Director for the facility.

10.

Defendant Dr. Keith McLaughlin was a physician employed by Armor at the Larimer County Jail. At all times relevant to this Complaint, Defendant Dr. Keith McLaughlin was a citizen of the United States, was a resident of the State of Colorado. At all times relevant to the claims, Dr. McLaughlin was acting under the color of state law and McLaughlin was responsible for knowing and acting in accordance with all regulations, policies, and procedures of both Larimer County Jail and his employer, Defendant Armor Correctional Health Services, while upholding his responsibility as the Licensed Physician or Medical Director for the facility.

11.

Advanced Registered Nurse Practitioner Defendant Hannah Holiday was employed by Armor at the Larimer County Jail. At all times relevant to this Complaint, Defendant Holiday was a citizen of the United States, was a resident of the State of

Colorado. At all times relevant to the claims, Defendant Holiday was acting under the color of state law and Defendant Holiday was responsible for knowing and acting in accordance with all regulations, policies, and procedures of both Larimer County Jail and her employer, Defendant Armor Correctional Health Services.

12.

Defendant Medical Assistant Michelle Wilson was employed by Armor at the Larimer County Jail. At all times relevant to this Complaint, Defendant Wilson was a citizen of the United States, was a resident of the State of Colorado. At all times relevant to the claims, Defendant Wilson was acting under the color of state law and Defendant Wilson was responsible for knowing and acting in accordance with all regulations, policies, and procedures of both Larimer County Jail and her employer, Defendant Armor Correctional Health Services.

13.

Defendant Armor Correctional Health Services, Inc. (Armor), is a private corporation headquartered in Florida at 4960 SW 72nd Ave # 400, Miami, 33155. Armor operates and conducts business in many states, including Colorado. Armor, the Larimer County BOCC, and Defendant Sheriff Smith initially entered into a contract on February 21, 2017. At all times relevant to this Complaint, Defendant Armor was acting under the color of state law in its capacity as the contracted medical provider for the Larimer County Jail in Fort Collins, Colorado.

14.

Collectively Defendants Dr. Davis, Dr. McLaughlin, Hannah Holiday, Michelle Wilson, and Armor are "the Armor Defendants" or "the Armor medical providers."

## **RELEVANT FACTS**

**I.      Plaintiff complied with all pre-filing requirements**.

15.

On July 1, 2020, counsel for Mr. Napier mailed a CORA request seeking all records concerning Mr. Napier's detention in Larimer County Jail to Larimer County Jail, the Larimer Sheriff's Office, the El Paso Sheriff, the Weld County Jail, and the Weld County Sheriff's Office.

16.

Only upon receipt of documents from Larimer County Jail did Mr. Napier become aware that a Poudre Valley Hospital physician had deemed it necessary that he receive a surgical consult for his jaw within two days.

17.

On August 31, 2020, the Larimer County Sheriff's Department notified Mr. Napier that there was no risk assessment performed on Alex Tovar when he was placed in a cell with Mr. Napier. At that point, Mr. Napier became aware that Defendants failed to perform a risk assessment as required by their own guidelines.

18.

On September 25, 2020, counsel for Mr. Napier mailed a subsequent notice of claim to Attorney General Weiser, Larimer County, and Larimer County Sheriff's Office.

II.     **Larimer County Jail has a threat assessment policy to classify prisoners based on their threat level to others.**

19.

The Larimer County Sheriff's Office has a Policy Manual governing Classification Levels.

20.

According to the Classification Policy, "[i]nmates are classified into specific custody levels in order to provide for their welfare and the overall security of the facility."

21.

According to the Classification Policy, "[a]n inmate's behavior, current charges, bond amounts, and criminal history are used to determine the classification level for all inmates."

22.

The Classification Policy identifies distinct housing classifications, such as (1) general population, (2) administrative segregation, (3) disciplinary detention, (4) maximum security, (5) protective custody, (6) facility-initiated separation, and (7) special considerations.

23.

According to the Classification Policy, "[m]aximum security inmates are red tag inmates in high security housing that present a threat to the safety of staff and the facility. These are also known as close custody inmates."

24.

According to the Classification Policy, the facility can separate inmates based on their risk level: "[a] facility-initiated separation is initiated in response to staff concerns, physical altercations, threats, or inmate behavior or when no reasonable alternative exists. The shift supervisor completes the consent form outlining the conditions of facility-initiated separation."

25.

Critically, the Classification Policy omits any criteria for determining when an inmate should be classified in maximum security housing. The Classification Policy identifies a housing classification for maximum security, but the Policy simply states that maximum security inmates "present a threat to the safety of staff and the facility." The lack of any criteria in the policy and, as discussed below, the lack of any implementation of the policy, is tantamount to having no classification-housing policy at all. Consequently, inmates convicted of aggravated violent crimes are commingled with those who are first offenders or convicted of nonviolent crimes.

**III.    Mr. Napier was a low-risk inmate who posed no threat to anybody.**

26.

On or about March 12, 2020, Mr.  Napier was booked into the Larimer County Jail with JMS ID 2008878.

27.

Mr. Napier was booked for a misdemeanor harassment charge, which was over 5 years old, and which was his first and only offense.

28.

Upon arrival, Larimer County jail correctional officers took Mr. Napier's fingerprints and gave him a medical exam. At that point, Larimer correctional officers would have been able to run a background check on Mr. Napier.

29.

Defendant John Doe 2 failed to conduct a face-to-face interview with Mr. Napier to evaluate him for housing classification purposes.

30.

Defendant John Doe 2 officer failed to tell Mr. Napier what housing classification level he had been assigned or if he had been assigned one at all.

31.

Defendant John Doe 2 had a duty to apply the Classification Policy to determine Mr. Napier's threat level. Had he done so, the threat level for Mr. Napier would have been very low because Mr. Napier was a first-time offender who otherwise had never been arrested.

32.

On August 31, 2020, in response to open records request from Mr. Napier's attorney, the Larimer County Sheriff Office stated that "The Larimer County Sheriff's Office has no responsive records for your request for Classification Levels for Mr. Tovar and Dustin Napier in March 2020." Therefore, based on information obtained through CORA requests, none of the Larimer County Defendants conducted a classification assessment on Mr. Napier.

33.

From entering Larimer Jail at 11:00 a.m. until 3:00 a.m. the next morning Mr.

Napier was housed in a holding cell.

34.

On March 13, 2020, officers moved Mr. Napier to a dormitory bay.

**IV.   Larimer County Defendants placed Mr. Napier in a cell with Alex Tovar, a violent offender with a long list of violent crimes.**

35.

On March 13 or March 14, 2020, correctional officers placed Mr. Napier in a cell

with Alex Tovar.

36.

Mr. Tovar had a lengthy criminal record that included multiple convictions for

felonies and aggravated assaults:

- On March 12, 2007, Tovar was arrested for 3rd degree assault.

- On July 5, 2007, Tovar was arrested for theft.

- On November 1, 2010, Tovar was arrested for theft and 2nd degree criminal trespass.

- On November 27, 2010, Tovar was booked for 1 Degree Criminal Trespass, Possession of Burglary Tools, Theft, and Contribution to the Delinquency of a Minor.

- On March 2, 2011, Tovar was booked for Harassment, Domestic Violence, Reckless Driving, ID Theft, Criminal Trespass, Possession of Burglary

Tools, Theft, Contribution to the Delinquency of a Minor, Violation of a Restraining Order.

- On April 2, 2011, Tovar was arrested for violation of a restraining order.

- On July 23, 2011, Tovar was arrested for violation of a restraining order.

- On August 17, 2011, Tovar was booked for 1st Degree Criminal Trespass (Felony), Harassment, Violation of a Restraining Order.

- On October 14, 2011, Tovar was arrested for theft, underage possession/1st degree criminal trespass.

- On October 15, 2011, Tovar was booked for 1st Degree Criminal Trespass, Theft, Underage Possession/Drink Alcohol, Reckless Driving.

- On February 15, 2012, Tovar was booked for 1st Degree Criminal Trespass and Theft.

- On August 7, 2012, Tovar was arrested for felony menacing.

- On August 10, 2012, Tovar was booked for aggravated motor vehicle theft, criminal impersonation, driving with a suspended license, careless driving, marijuana offense, failure to comply auto trespass, auto trespass, failure to comply with protection order, harassment, aggravated motor vehicle theft, theft, failure to comply (theft).

- On October 30, 2012, Tovar was booked for 1st degree criminal trespass, aggravated motor vehicle theft, 1st degree criminal trespass.

- On May 17, 2013, Tovar was booked for felony menacing, 3rd degree assault, and felony menacing.

- On May 26, 2016, Tovar's parole was revoked.

- On July 26, 2016, Tovar committed a violation while in corrections ("Resident Comm Corr Viol").

- On August 12, 2017, Tovar was booked for false imprisonment, 3rd degree assault, child abuse, and domestic violence enhancement.

- On June 19, 2019, Tovar was booked for 2nd degree kidnapping, obstruction of telephone/telegraph service, 3rd degree assault, domestic violence enhancement, and assault 3rd degree.

- On August 4, 2019, Tovar was booked for tampering with physical evidence, violation of bail bond conditions, kidnapping 2, 3rd degree assault, 2nd degree kidnapping, harassment, 3rd degree assault, 2nd degree assault, retaliation against a witness/victim, and a domestic violence enhancement.

- On December 11, 2019, Tovar was arrested for harassment.

- On February 4, 2020, Tovar was arrested for 3rd degree assault. This incident took place while Tovar was incarcerated.

37.

Upon information and belief, the jail classifies inmates with Tovar's criminal record, including numerous assaults and kidnapping charges, as a maximum-security threat.

38.

Upon information and belief, Defendant John Doe-1, a correctional officer tasked with assigning housing classifications, failed to classify Tovar as a violent (up to and including maximum-security) prisoner, while also failing to classify Mr. Tovar at all. Had Tovar been classified properly (e.g., had he been classified at all), he would have never been housed in a cell with Mr. Napier. This was a violation of the Classification Policy because the policy was either misapplied or it was ignored.

39.

Upon information and belief, Defendant John Doe-2, a correctional officer tasked with classifying Mr. Napier, failed to classify Mr. Napier before he was housed in a cell with Mr. Tovar, while also failing to classify Mr. Tovar at all. Had Mr. Napier been classified properly, he would have never been housed in a cell with Tovar. This was a violation of the Classification Policy because the policy was either misapplied or it was ignored.

40.

Upon information and belief, Defendant Sheriff Smith and Defendant Captain Palmer failed to hold correctional officers accountable for failing to apply the classification policy and thus, at the very least, attempt to ensure that the Classification Policy was correctly implemented in March 2020.

41.

Upon information and belief, the BOCC, Sheriff Smith and Captain Palmer knew non-violent inmates were housed in the same cells with maximum-security violent

inmates and thus that the Classification Policy was not being followed. Therefore, the BOCC, Sheriff Smith and Captain Palmer knew that non-violent inmates were needlessly being exposed to a significant risk of harm such as the physical injury suffered by Mr. Napier.

42.

Upon information and belief, the BOCC, Sheriff Smith, and Captain Palmer enacted, approved, and/or implemented a policy whereby violent (including maximum security risk) and non-violent inmates were housed together in the same cells—without any attempt to classify them by risk threat to each other and staff—thereby needlessly exposing inmates to a significant risk of harm. *See Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1029–30 (11th Cir. 2001) (en banc) (holding that a lack of classification and separation of violent prisoners supports finding a Constitutional violation); *Janes v. Hernandez,* 215 F.3d 541 (5th Cir. 2000) (imposing municipal liability on a county for failure to segregate violent inmates from nonviolent inmates; the jail policy housed inmates together, regardless of their known violent or nonviolent histories).

43.

In the alternative, based on the lack of criteria for the maximum-security policy and the failure to implement the Classification Policy at all, the BOCC and Larimer County Jail do not have, as a practical and real matter, a classification policy for housing inmates. Failure to have such a policy unconstitutionally endangers inmates.

**V.     From his cell, Mr. Napier's only recourse to call for help was to press an intercom button.**

44.

The "pod" Mr. Napier was housed in had two floors with approximately twenty-five cells on each floor. In total, approximately seventy-five to one hundred prisoners were housed in the pod.

45.

The two levels of cells enclosed a ground level floor with metal tables where the prisoners ate their meals.

46.

A guard booth was positioned at one end of each of the corridor/walkways.

47.

The detainees and prisoners outnumbered their guards. On each floor at any one time there was at most two correctional officers. When the first floor or second floor cell detainees and prisoners were let out at mealtime, the roughly fifty inmates outnumbered the two correctional officers overseeing them.

48.

Correctional officers performed rounds in the prison approximately once every thirty minutes.

49.

When correctional officers performed rounds on the floor no one was in the guard booth.

50.

In Mr. Napier's pod, the cells had heavy doors. There were long, narrow windows in the doors. Each window was about twelve inches long and three to four inches wide with thick, shock resistant glass. Due to the thickness of the doors and windows, inmates cannot communicate with guards through the doors.

51.

The only viewpoint into a cell is the narrow window. To see through the window a correctional officer must stand directly in front of the window.

52.

Inmates in the Larimer County Jail only have one real method for contacting correctional officers: each cell has an intercom system. Inmates use the intercom system to request necessities, like toilet paper. Inmates also use the intercom system to alert correctional officers to medical or security emergencies.

**XI.** **From March 13 or 14, 2020, to March 19, 2020 Mr. Napier repeatedly requested that he be placed in a different cell because he feared for his safety.**

53.

From the first day Mr. Napier was housed with Tovar, Mr. Napier knew that Tovar did not like him and that this placed him in danger.

54.

On or around March 17, 2020, Mr. Napier woke up and Tovar made comments and gestures that made Napier feel as if his life was in danger, a reality that led him to speak to Albrook.

55.

During his stay in jail, while on a 30-minute recreational break, Mr. Napier occasionally spoke with two correctional officers, Officer Albrook and another officer.

56.

Mr. Napier repeatedly asked Officer Albrook and another officer to place him in a cell with a different cell mate because he feared Tovar was dangerous and would physically harm him. Mr. Napier said "[H]e's dangerous and I don't feel safe."

57.

Altogether, Mr. Napier asked Officer Albrook and another officer five times to place him in a cell with a different cell mate due to Mr. Napier's fear of Mr. Tovar physically harming him.

58.

Officer Albrook and the other officer told Mr. Napier that it was too much of a hassle to place Mr. Napier in another cell because if they did that for Mr. Napier they would have to do it for other inmates.

59.

Officer Albrook and the other officer did not inform Mr. Napier of other ways to request being placed in a different cell. Officer Albrook and the other officer did not tell Mr. Napier to submit a written request or to make a request to another officer or shift supervisor.

60.

Neither Officer Albrook nor the other officer questioned Mr. Napier further about Mr. Napier's fear of physical violence at the hands of his cellmate, Tovar.

61.

Larimer County Jail has a protective custody policy. It states that "[p]rotective custody inmates are housed in segregation when a threat **or a perceived threat to the inmate's personal safety exists** and no reasonable alternative is available."

62.

Upon information and belief, the request by Mr. Napier to be placed in a different cell because of, according to Mr. Napier, the physical threat Tovar posed to him triggered a duty by Officer Albrook to assess whether Mr. Napier should be placed in protective custody.

63.

Upon information and belief, Mr. Napier's essential request for protective custody required Officer Albrook to assess Tovar's risk factors.

64.

Officer Albrook and the other officer ignored Mr. Napier's requests to be placed in another cell (for example in a protective custody cell), away from Tovar, as evidenced by the fact that neither Officer Albrook nor the other officer interviewed Mr. Napier nor even asked him to submit a written statement documenting his fears that Tovar would harm him.

65.

Upon information and belief, Officer Albrook and the other officer took no steps to even investigate whether Mr. Napier should be placed in protective custody or in another cell/housing unit.

66.

Upon information and belief, Officer Albrook violated both jail policy and violated Mr. Napier's constitutional right to be safe from harm when he failed to, at the very least, assess whether Mr. Napier should be placed in protective custody and/or in a different cell/housing unit.

67.

In addition, upon information and belief, Officer Albrook knew the initial placement of Mr. Napier with Tovar was wrong because he reviewed both Mr. Napier's lack of a criminal history and Tovar's high-risk factors, but Officer Albrook continued to ignore the Classification Policy and failed to move Mr. Napier to a different cell.

**XII.    On March 19, 2020 Tovar brutally assaulted Mr. Napier.**

68.

On March 19, 2020, Mr. Napier was discussing the lack of interesting reading material at Larimer Jail via phone with his wife. The books were mostly either bibles or teenage vampire novels.

69.

Tovar took offense at Mr. Napier's apparent criticism of the Bible.

70.

Tovar told Mr. Napier "I'm in here from some real shit, you better watch your ass."

71.

A few minutes later, when Mr. Napier was standing up in the cell, Tovar approached Mr. Napier from behind, put him in a choke hold, and began punching him repeatedly.

72.

Mr. Napier fell to the ground in a fetal position and tried to protect his head.

73.

Underneath the blows, Mr. Napier struggled to reach up and press the intercom system to call for help.

74.

In the process of reaching up to press the intercom system, which was the only way for Mr. Napier to get help, Mr. Napier left his head exposed for several crucial seconds.

75.

At this point a blow from Tovar fractured Mr. Napier's jaw.

76.

All in all, Tovar punched Mr. Napier approximately twenty times.

77.

Tovar told Mr. Napier to keep quiet, "Do not say anything to the deputy, ask for toilet paper or I'll kill you." Over the intercom, Tovar then told the guards that he had buzzed the intercom to request more toilet paper.

### XIII. Nurses see that Mr. Napier has suffered a serious injury and provide initial medical assessment confirming a massive fracture of his jaw.

78.

Mr. Napier made his way to the guard booth. It was obvious he had been injured because his face was bleeding. Officer Albrook—the same officer who Napier had previously requested protection from Tovar--asked what happened to him.

79.

Three nurses, Registered Nurses Sarah Theisen, Megan, and Lynn were called to the pod and they took pictures of Mr. Napier's injury in a small room behind the guard booth.

80.

The assault resulted in Mr. Napier suffering an open mandibular injury. At the front of Mr. Napier's jaw, between the middle teeth, the gum was split apart showing bone. He suffered an open fracture which was bleeding profusely.

81.

Nurse Theisen's medical notes of the encounter recorded the seriousness of Mr. Napier's injury:

> Patient sitting in conference room, alert & oriented x4. Resp even. Blood noted to lips, mouth. Redness to face and neck.

Patient reports he was hit in mouth and then attempted to cover face and [sic] protect self. Patient denies any loss of consciousness. Patient ambulated to medical for further assessment without any difficultly. PERRLA. No other injuries noted to head or scalp. Patient reports "ringing to ears," TM intact bilaterally. Patient able to open mouth approx 25% with reported pain. No crepitus noted to jaw. Laceration to gum line between teeth #22/23, oozing blood. No active bleeding or laceration noted from tongue. Patient reports multiple teeth "feel loose." All teeth intact at this time.

### XIV.   Mr. Napier goes to Poudre Valley Hospital where the physician recommends a surgical consult within two days—which Defendants deny Mr. Napier.

82.

On March 19, 2020, an officer in a patrol car took Mr. Napier to Poudre Valley Hospital (UC Health) for treatment.

83.

On March 19, 2020, Registered Nurse Cheyenne Palmer noted at 5:37 pm that the transfer to Poudre Valley Hospital was authorized by Dr. Charles Davis.

84.

At Poudre Valley Hospital, Mr. Napier received a CAT-scan.

85.

A physician at Poudre Valley Hospital noted:

- Right mandibular ramus moderately displaced oblique fracture extending into the coronoid process and through the mandibular foramen.
- Left anterior mandibular body mildly displaced fracture extending through the alveolar ridge between the left mandible second incisor and canine. Correlation with any evidence of tooth displacement/instability is recommended.
- Maxillofacial surgery consultation is required.

86.

The physician who saw Mr. Napier wrote in his paperwork that Mr. Napier needed a surgical consultation within two days.

87.

The physician who saw Mr. Napier also prescribed him hydrocodone-acetaminophen (NORCO) every six hours for pain.

XV.     **Defendants Dr. Davis, Dr. McLaughlin, Holiday, and Wilson failed to arrange for Mr. Napier to have a surgical consult at all (let alone within two days) and instead waited for Mr. Napier to be released.**

88.

The surgical consultation did not happen.

89.

The physician at Poudre Valley Hospital gave paperwork concerning Mr. Napier's condition and recommendation for a surgical consult to the same officer who brought Mr. Napier to the hospital.

90.

The physician did not talk to Mr. Napier about his condition.

91.

Mr. Napier was brought back to Larimer County Jail at around 8:00 p.m. on March 19, 2020.

92.

The officer who brought Mr. Napier back from the hospital gave Mr. Napier's hospital discharge paperwork, including the assessment that he needed an immediate surgical consult for his broken jaw, to the medical staff at the jail.

93.

On March 19, 2019, at 8:01 pm, Registered Nurse Suzanne Mondani noted in Mr. Napier's jail medical records that Mr. Napier had sustained an injury and would likely need surgery: "Pt with left/right displaced mandibular fx. Will likely need surgical repair. See discharge notes."

94.

Nurse Mondani wrote that she consulted with a medical provider, Dr. Charles Davis, at 8:01 p.m.

95.

At the same time, Nurse Mondani wrote a note stating: "Outside Provider Follow Up: Include location, provider, date, time, etc. as indicated on d/c form (Triggers task for scheduling)." Next to this entry Nurse Mondani wrote: "Yes (Blake Joseph Hyde MD 1120 E. Elizabeth ST STE F 101 FC CO 80524 Otolaryngology specialist 970-221-1177."

96.

Mr. Napier was placed in an isolation cell or protective custody cell upon his arrival from the hospital.

97.

Upon information and belief, Defendant Dr. Davis consulted with Nurse Mondani and/or reviewed Nurse Mondani's medical notes and Mr. Napier's discharge notes. Therefore, Dr. Davis was aware of Mr. Napier's injury and knew that a physician had ordered Mr. Napier to receive a surgical consult within two days.

98.

Upon information and belief, in his role as a medical provider at Larimer County Jail, Defendant Dr. Davis had the authority to order that Mr. Napier receive an immediate surgical consult, yet he failed to do so.

99.

Upon information and belief, Defendant Dr. Davis had the authority to at the very least begin the process that would allow Mr. Napier to receive an immediate surgical consult, yet he failed to do so.

100.

On the morning of March 20, 2019, Advanced Registered Nurse Practitioner Hannah Holiday reviewed Mr. Napier's medical record and noted that (1) Mr. Napier should receive a follow-up in two days and that (2) a surgical consult was required:

> Reviewed 3/19/20 PVH after altercation. Closed fracture of right ramus of mandible. **Closed fracture of left side of mandibular body F/U [follow up] with otolaryngology in 2 days**. CT face: Right mand bular [sic] ramus moderately displaced oblique fracture extending into the coronoid process and through the mand bular [sic] foramen. Left anterior mand bular [sic] body mildly displaced fracture extending through the alveolar ridge between the left mand

ble [sic] second incisor and canine. **Maxillofacial surgery consultation is required**. Pt placed on Clindamycin.

(emphasis added).

### 101.

Upon information and belief, in her role as a medical provider at Larimer County Jail, Defendant Holiday had the authority to order an immediate surgical consult for Mr. Napier, yet she failed to do so.

### 102.

Upon information and belief, Defendant Holiday had the authority to at the very least begin the process that would allow Mr. Napier to receive an immediate surgical consult, yet she failed to do so.

### 103.

On March 21, 2019, Nurse Mondani talked to Defendant Dr. McLaughlin about Mr. Napier's condition. Nurse Mondani requested that a vitamin drink, Ensure, be added to Mr. Napier's diet because Mr. Napier was having trouble eating due to his injured mouth and an upset stomach from the antibiotics.

### 104.

Upon information and belief, Defendant Dr. McLaughlin reviewed Mr. Napier's medical charts, was aware of his injury, and was aware Mr. Napier needed a surgical consult right away.

105.

Upon information and belief, in his role as a medical provider at Larimer County Jail, Defendant Dr. McLaughlin had the authority to order that Mr. Napier receive an immediate surgical consult, yet he failed to do so.

106.

Upon information and belief, Dr. McLaughlin had the authority to at the very least begin the process that would allow Mr. Napier to receive an immediate surgical consult, yet he failed to do so.

107.

On March 20, 2019, Medical Assistant Michelle Wilson told Mr. Napier he needed surgery, as evidence by the fact that, upon information and belief, Medical Assistant Michelle Wilson had reviewed Mr. Napier's medical files and therefore knew that Mr. Napier was supposed to receive a surgical consult within two days.

108.

Medical Assistant Michelle Wilson gave Mr. Napier a Google print-out sheet listing ear, nose, and throat physicians that he could consult **once he was released from jail.**

109.

On March 20, 2019, at 11:21 am, Medical Assistant Michelle Wilson noted:

> Pt instructed to follow up with ENT within 2 days. Went to pod to speak to pt. He believes he is bonding on Monday 3/23 after court and is from Colorado Springs. We agreed on the following plan: I will place a list of ENT"s in Colorado Springs for him to follow up with in his booking file. If he is not able

to bond after court on Monday, I will schedule him here. Also explained the victim's advocate fund.

110.

Significantly, Mr. Napier *never* "agreed" to delay his medical care until after he bonded out, and notably: making false statements such as the one made by Nurse Wilson, on government records, intentionally, is a crime. Instead, Defendant Wilson informed Mr. Napier that seeking medical care—after he was released from jail—was his **only** recourse.

111.

Also, during her discussion with Mr. Napier, Defendant Wilson never informed Mr. Napier that the original physician who saw him said that he should receive a surgical consult within two days.

112.

Upon information and belief, in her role as a medical provider at Larimer County Jail, Defendant Wilson had the authority to order an immediate surgical consult for Mr. Napier, yet she failed to do so.

113.

 Upon information and belief, Defendant Wilson had the authority to at the very least begin the process that would allow Mr. Napier to receive an immediate surgical consult, yet she failed to do so.

114.

On March 22, 2019, at 9:05 am, Registered Nurse Lynn Schultz conducted a "confinement clearance" on Mr. Napier.

115.

Upon information and belief, Nurse Schultz conducted the interview to determine if Mr. Napier was ready to be sent back to general population housing.

116.

Larimer County Jail medial staff did not give Mr. Napier any further information about his next steps for medical treatment.

117.

Mr. Napier did not receive any medical attention for four days for his broken jaw.

118.

In sum, Dr. Charles Davis, Dr. McLaughlin, Nurse Hannah Holiday, and Medical Assistant Michelle Wilson, left Mr. Napier without treatment and without a surgical consult for four days—despite each one of these defendants having the authority to order Mr. Napier his immediate surgical consult.

119.

In sum, Defendants Dr. Charles Davis, Dr. McLaughlin, Holiday, and Wilson left Mr. Napier without treatment, without care, and without a surgical consult for four days—despite each one of these defendants having the authority to, at the very least, begin the process necessary for Mr. Napier to receive his surgical consult.

120.

During those four days, Mr. Napier was unable to eat solids, unable to sleep, unable to lay down, and continuously had to swallow his own blood. He sat in jail with an open jaw fracture, without necessary care, and without appropriate pain medication. Defendants Dr. Davis, Dr. McLaughlin, Holiday, and Wilson showed deliberate indifference to Mr. Napier in failing to report his need for care and failure to provide him care, respectively.

121.

As outlined above, the fact that the individual medical providers failed to refer Mr. Napier to a surgical consult within two days and instead let him suffer for four days evinces that the medical staff were not properly trained.

122.

Armor's failure to train its staff caused Mr. Napier to experience extreme pain and suffering and, eventually, permanent injury.

123.

Mr. Napier was taken to a court hearing on March 23, 2020 and released from jail that same day.

**XVI.   Upon release, Mr. Napier was finally able to obtain private surgical care.**

124.

On March 24, 2020, Mr. Napier obtained private surgical care to repair his open fracture.

125.

On March 24, 2020, the private physician noted that "25 year old male [was] referred by the hospital for evaluation of mandible fracture. Pt was punch[ed] in [face] while in jail, sustaining a left parasymphysis fracture and right ramus fracture."

126.

The surgical notes described the operation as follows: "Erich arch bars placed along the maxillary and mandibular dentition from 1st molar to 1st molar with 24g wire. Heavy elastics used to close patient into appropriate occlusion."

127.

On April 1, 2020, Mr. Napier returned to his surgeon for follow up and further care.

128.

Mr. Napier continued to proceed with care and recovery through May 2020. At that time, it became clear that Mr. Napier's nerve damage on his lower jaw was now permanent.

129.

Mr. Napier continues to experience pain in his jaw during cold weather and at times suffers pain or difficulty chewing and swallowing when eating.

130.

Upon information and belief, Mr. Napier's permanent injury was a direct result of Defendants' acts and failure to take reasonable steps to abate a known risk of serious injury.

### XVII.  Armor, BOCC and Sheriff Smith have institutional incentives to cut costs by delaying or denying offsite medical treatment.

131.

Among the most expensive costs of providing services to prisoners is offsite medical treatment. Due to their inherent duration and intensity, hospitalizations represent a significant health care cost.

132.

In 2018, onsite medical costs counted for 83.5% of Larimer County Jail's budget, at a cost of $3,591,303. Off-site medical costs counted for the third highest category of the jail's budget, at $77,643 or 1.8%.

133.

The Larimer County Jail was designed and built with the capacity to house 450 inmates.

134.

In January 2021, the Larimer County Jail housed an average of 517 inmates. At times, the Larimer County Jail has held far more inmates. In July 2017, the Larimer County Jail housed a high of 623 inmates.

135.

In March 2020, the Larimer County Jail housed an average of 492 inmates.

136.

In Larimer County's 2018 Comprehensive Annual Financial Report, Larimer County noted that the county was experiencing "severe overcrowding in the jail."

137.

Extreme overcrowding in the jail would also lead to a corresponding increase in medical expenses and expenditures by Larimer County. Armor has a corporate history of cutting costs by denying or delaying medical care to prisoners.

138.

In a 2019 article, the *Miami New Times* reported on Armor's history of providing inadequate medical care. The story quoted a former Armor nurse, Carolyn Rubin, who stated: "There was a strong corporate push for the doctor not to send patients out due to money," and "[i]t was our duty to keep them there as long as possible, to prevent costs of the hospital, plus pulling deputies out of the jail that have to go sit with the patient at the hospital. The jail also frowned upon it too."

139.

In 2016, the State of New York sued Armor after eleven individuals died in Armor's care at the Nassau County Jail. In an article discussing Armor's settlement with New York, a former Armor nurse stated: "Medications are being cut, supplies are being cut, positions are not being there," and "I don't think there should be a price tag on anyone's life."

### XIV.   The contract between Armor, BOCC, and Sheriff Smith led Defendants to prioritize cutting costs by delaying or denying offsite medical treatment.

140.

On February 21, 2017, Armor, the Larimer County BOCC, and Defendant Sheriff Smith entered into a contract for Armor to provide medical services at the jail.

141.

Upon information and belief, the initial contract has been renewed several times. But the terms of the 2017 contract are representative of the current agreement the parties are operating under.

142.

The initial contract provided that Larimer County would pay Armor $3,549,756. At the time, the amount was calculated on the basis of Larimer County's average daily population for 2016 of 541 inmates.

143.

The contract provided that Larimer County would pay an additional $2.49 per incarcerated person per day rate for each deviation from 541 inmates.

144.

In contrast, in 2015, the Colorado Department of Corrections spent an average of $6,641 per incarcerated person, which is $18.19 per incarcerated person per day.

145.

The 2017 contract between Larimer County and Armor states that Armor would assume no responsibility for paying offsite medical costs. But Armor stated that it would seek to "manage inpatient hospital care in an effort to return patients to the jail as soon as medically appropriate."

146.

Armor would notify Larimer County and the Sheriff if any inmate required was hospitalized for a time longer than Armor deemed medically necessary.

147.

Upon information and belief, the BOCC and Sheriff Smith encouraged medical providers to delay or deny off-site medical care when possible.

148.

Upon information and belief, Armor encouraged medical providers to delay or deny off-site medical care when possible.

149.

Upon information and belief, the BOCC, Sheriff Smith, and Armor's polices led to medical providers failing to refer Mr. Napier for a surgical consult for the four remaining days while he was incarcerated.

## COUNT I
## VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENT
## DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS PURSUANT
## TO 42 U.S.C § 1983
*(Federal claim against Dr. Davis, Dr. McLaughlin, Hannah Holiday, and Michelle Wilson in their individual capacities)*

150.

Plaintiff fully incorporates paragraphs 1 through 149 and any paragraph this Court deems relevant as if fully stated herein to support this Count.

151.

At all times relevant to this claim, Defendants Dr. Davis, Dr. McLaughlin, Hannah Holiday, and Michelle Wilson were operating under color of state law.

152.

Based on the facts included to support this Count I, Defendants Dr. Davis, Dr. McLaughlin, Hannah Holiday, and Michelle Wilson actually knew of Mr. Napier's serious medical needs, yet, nevertheless refused to take reasonable steps to provide adequate medical attention to Mr. Napier such as (1) the intentional refusal to provide aid to him while he was incarcerated; (2) the intentional decision to leave him with no care for four days, unable to feed, drink, or sleep, swallowing his own blood; (3) the intentional refusal to provide adequate pain management in contravention of medical recommendation; (4) the intentional refusal to refer him to an oral surgeon within two days, as a Poudre Valley Hospital physician had deemed necessary; and (5) the intentional refusal to even begin the process necessary to ensure that Mr. Napier even has a chance at receiving his surgical consult, inter alia. These acts or omissions violated Mr. Napier's constitutional rights and caused Mr. Napier's injuries.

## COUNT II
## VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS
## FAILURE TO PROVIDE ADEQUATE MEDICAL CARE
## *MONELL* CLAIM PURSUANT TO 42 U.S.C § 1983
(*Entity liability claim against Defendants Smith and BOCC in their official capacities*)

153.

Plaintiff fully incorporates paragraphs 1 through 149 and any paragraph this Court deems relevant as if fully stated herein to support this Count.

154.

The U.S. Constitution imposes a duty on Defendants the BOCC and Sheriff Smith, to provide adequate medical care to Larimer County Jail population.

155.

Based on the facts incorporated to support this Count, Defendants BOCC and Sheriff Smith are aware of numerous serious injuries and deaths that have occurred as a result of the inadequate medical system at Larimer County Jail, upon information and belief.

156.

Based on the facts incorporated to support this Count, by policy, practice, or custom, the BOC and Sheriff Smith maintained an inadequate medical-care system that incentivized Armor to save costs by denying medical care or refusing to provide off-site medical care.

157.

Based on the facts incorporated to support this Count, the BOCC and Sheriff Smith's policies, practices, and customs were the moving forces behind Mr. Napier's inability to obtain adequate treatment for his jaw, which caused him damages, including increased medical costs and physical pain and suffering.

### COUNT III
### VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS
### FAILURE TO CLASSIFY AND ADEQUATELY MONITOR PRISONERS
### *MONELL* CLAIM PURSUANT TO 42 U.S.C § 1983
(*Entity liability claim against Defendants Smith and the BOCC in their official capacities*)

158.

Plaintiff fully incorporates paragraphs 1 through 149 and any paragraph this Court deems relevant as if fully stated herein to support this Count.

159.

Based on the facts incorporated to support this Count, Defendants failed to protect Mr. Napier from an inmate-on-inmate assault. Mr. Napier's injury was the result of the unconstitutional conditions of his confinement, including (1) an insufficient classification process/classification system that in reality did not exist and (2) double-celling inmates who are not adequately monitored.

160.

Housing inmates together in cells without any ability for guards to detect assaults violates the Eighth and Fourteenth Amendments. *See Lopez v. LeMaster*, 172 F.3d 756,762 (10th Cir. 1999) (understaffing prevented continuous observation, and "there was no TV monitor, no guard in sight, and no way to call for help"); *Lareau v. Manson*, 651 F.2d 96, 108 & n.11 (2d Cir. 1981) (finding a severe risk of harm caused by "double cells from which [detainees] can contact guards only with the greatest difficulty" and "the inability of the guard to view the interior of the cells from his station inside the bubble").

161.

A lack of classification and separation of violent prisoners also supports finding a Constitutional violation. *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1029–30 (11th Cir. 2001) (en banc); *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974) (finding defendant prison supervisor was liable when assault was caused in part by lack of classification "resulting in the intermingling of inmates convicted of aggravated violent crimes with those who are first offenders or convicted of nonviolent crimes"); *see Berry v. City of Muskogee*, 900

F.2d 1489, 1497–98 (10th Cir. 1990) (finding failure to separate crime partners constituted liability).

162.

Based on the facts incorporated to support this Count, when inmates are housed together in cells, the failure to have any classification system in place is "so obvious" a failure that it could properly be characterized as "deliberate indifference" to constitutional rights. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989); *Winton v. Board of Commissioners of Tulsa County, Okla.*, 88 F. Supp. 2d 1247, 1268 (N.D. Okla. 2000) (noting that a "lack of inmate segregation and classification" could constitute a "de facto polic[y] of inaction" supporting liability).

163.

Based on the facts incorporated to support this Count, Defendants the BOCC, and Sheriff Smith were aware of the substantial risk of harm to inmates by the Larimer County Jail's failure to have a classification system. Also, the lack of criteria in the Classification Policy for when inmates should be housed in maximum security, combined with the failure to implement the policy, was tantamount to no policy at all. This led to violent prisoners being housed with nonviolent prisoners, such as Tovar being housed with Mr. Napier, and exhibited deliberate indifference to Mr. Napier's safety.

164.

In the alternative, based on the facts incorporated to support this Count, the BOCC and Sheriff Smith were aware of the substantial risk of harm to inmates because the jail

staff often failed to implement a classification system, which led to violent prisoners being housed with nonviolent prisoners, such as Tovar being housed with Mr. Napier, and exhibited deliberate indifference to Mr. Napier's safety.

165.

Based on the facts incorporated to support this Count, the BOCC and Sheriff Smith were aware of fights, serious injuries, or deaths that had occurred at the jail due to the failure to classify and segregate violent prisoners and the failure to adequately monitor inmates in their cells.

166.

Based on the facts incorporated to support this Count, the BOCC and Sheriff Smith are aware that prisoners are housed at random and double-celled, creating the potential for violence. Defendants are also aware that guards are unable to effectively monitor these cells and that if prisoners are attacked, prisoners are forced to fight off their attackers and then rely on an intercom system to call for help.

167.

Based on the facts incorporated to support this Count, the BOCC and Sheriff Smith each had the responsibility to oversee the Larimer County Jail and the power and authority create and enforce policies, practices, and customs within Larimer County Jail.

168.

Based on the facts incorporated to support this Count, by policy, practice, or custom, the BOCC and Sheriff Smith maintained an insufficient classification system

and/or failure to effectively monitor prisoners, based on the facts incorporated to support this Count.

169.

Based on the facts incorporated to support this Count, Defendants the BOCC and Sheriff Smith's policies, practices, and customs were the moving forces behind Mr. Napier's inability to obtain adequate treatment for his jaw, which caused him damages, including increased medical costs and physical pain and suffering.

170.

Based on the facts incorporated to support this Count, these Defendants ignored obvious problems with the failure to either have or implement a classification system and/or failure to effectively monitor prisoners, and as a result, the BOCC and Sheriff Smith permitted a constitutionally deficient classification and surveillance system to persist.

171.

Based on the facts incorporated to support this Count, these constitutionally deficient classification and surveillance systems at Larimer County Jail led to Mr. Napier being assaulted and were a direct cause of his injury.

**COUNT IV**
**VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS**
**FAILURE TO CLASSIFY & MONITOR PRISONERS**
**SUPERVISORY LIABILITY PURSUANT TO 42 U.S.C § 1983**
(*Supervisory liability claims against Defendants Smith and Palmer in their individual
capacities*)

172.

Plaintiff fully incorporates paragraphs 1 through 149 and any paragraph this Court deems relevant as if fully stated herein to support this Count.

173.

Defendants Sheriff Smith and Captain Palmer, together, have a responsibility to provide supervision and management over the Larimer County Jail correctional officers.

174.

Based on the facts incorporated to support this Count, Defendants Sheriff Smith and Captain Palmer failed to initially train their employees, individual correctional officers, on proper conduct and procedure, or failed to ensure that their employees implemented proper procedures on a continuing basis, thereby causing the violation of Mr. Napier's rights.

175.

Based on the facts incorporated to support this Count, Defendants Sheriff Smith and Captain Palmer were aware of the substantial risk of harm to inmates because the jail staff often failed to implement a classification system. This led to violent prisoners being housed with nonviolent prisoners, such as Tovar being housed with Mr. Napier.

176.

Based on the facts incorporated to support this Count, Defendants Sheriff Smith and Captain Palmer were aware of fights, serious injuries, or deaths that had occurred at the jail due to the failure to classify and segregate violent prisoners.

177.

Based on the facts incorporated to support this Count, by policy, practice, or custom, Sheriff Smith, and Captain Palmer failed to ensure that their staff maintained an adequate classification system.

178.

Based on the facts incorporated to support this Count, Sheriff Smith and Captain Palmer's policies, practices, and customs were the moving forces behind Mr. Napier being assaulted by Tovar.

## COUNT V
## VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS
## DELIBERATE INDIFFERNCE TO SERIOUS RISK OF HARM
## PURSUANT TO 42 U.S.C § 1983
*(Federal claim against Defendants John Does 1-2, Albrook in their individual capacities)*

179.

Plaintiff fully incorporates paragraphs 1 through 149 and any paragraph this Court deems relevant as if fully stated herein to support this Count.

180.

Based on the facts incorporated to support this Count, Defendants violated Mr. Napier's right to be protected and secure from inmate-on-inmate violence while incarcerated.

181.

Based on the facts incorporated to support this Count, Defendant John Does 1-2 unreasonably classified or failed to classify Alex Tovar and Mr. Napier, knew that Mr. Napier was being housed with a violent criminal but continued to ignore his classification, and this unreasonable classification created a substantial risk of harm to Mr. Napier.

182.

Based on the facts incorporated to support this Count, Defendant Albrook allowed Mr. Napier to remain in a cell with Tovar when he knew that Alex Tovar posed an excessive risk to Mr. Napier's health and safety and Defendant Albrook disregarded that risk.

183.

Based on the facts incorporated to support this Count, as a result of Defendants' acts or failures to take reasonable steps to abate a known risk of serious injury, Mr. Napier was attacked and beaten by Tovar and suffered extreme injuries and pain as well as extreme emotional distress and anguish.

**COUNT VI**
**VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENT RIGHT**
**FAILURE TO PROVIDE ADEQUATE MEDICAL CARE**
***MONELL* CLAIM PURSUANT TO 42 U.S.C § 1983**
(*Federal claim against Armor*)

184.

Plaintiff fully incorporates paragraphs 1 through 149 and any paragraph this Court deems relevant as if fully stated herein to support this Count.

185.

At all times relevant to this Complaint, Defendant Armor was acting under the color of state law when it provided medical services to the Larimer County Jail population because it was performing a traditional government function. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 51 U.S. 288, 296 (2001).

186.

Based on the facts incorporated to support this Count, Armor had a responsibility to provide supervision and management over the Larimer County Jail medical providers.

187.

Based on the facts incorporated to support this Count, Armor staff acted deliberately and indifferently to Mr. Napier's serious medical needs by failing to provide Mr. Napier adequate medical care to treat Mr. Napier's broken jaw, and instead allowing him to suffer in pain for four days.

188.

Based on the facts incorporated to support this Count, Defendant Armor has a policy, practice, or custom of delaying and denying medical care staff to save costs.

Defendant Armor knew that because of these policies and practices, individuals in its care would suffer serious injury or death. These policies and practices were the moving force behind Mr. Napier's constitutional violation and caused his serious physical pain and suffering and medical expenses.

## COUNT VII
## MEDICAL MALPRACTICE AND ORDINARY NEGLIGENCE
*(State claim against Dr. Davis, Dr. McLaughlin, Hannah Holiday, and Michelle Wilson in their individual capacities)*

189.

Plaintiff fully incorporates paragraphs 1 through 149 and any paragraph this Court deems relevant as fully stated herein to support this Count.

190.

Based upon the facts incorporated to support this Count, the negligence and malpractice of Defendants Dr. Davis, Dr. McLaughlin, Hannah Holiday, and Michelle Wilson, to include breaching the standard of care owed to Mr. Napier by failing to provide a surgical consult within two days for his obviously broken jaw, caused severe physical and mental harm/suffering to Mr. Napier. Defendants breached the standard of care owed to Mr. Napier, as well as committed other negligent acts that caused Mr. Napier harm, by amongst other failures: 1) not aiding him while he was incarcerated; 2) leaving him with no care for four days, unable to feed, drink, or sleep, swallowing his own blood; 3) administering inadequate pain management in contravention of medical recommendation; and 4) not referring him to an oral surgeon within two days, as a Poudre Valley Hospital physician had deemed necessary. These actions or omission

breached the standard of care Defendants owed to Mr. Napier. As a direct result of these breaches of the standard of care, these acts or omissions caused Mr. Napier's injuries.

## COUNT VIII
## RESPONDEAT SUPERIOR
*(State claim against Armor)*

191.

Plaintiff fully incorporates paragraphs 1 through 149 and any paragraph this Court deems relevant as fully stated herein to support this Count.

192.

Based on the incorporated facts to support this Count, the Armor Defendants were acting as employees of Amor when they each violated the duty of care owed to Mr. Napier, an inmate under their care suffering from an obvious injury to his jaw. Consequently, Mr. Napier is entitled to all damages permissible under controlling law, as well as attorney fees and cost regarding this lawsuit.

## ATTORNEY FEES

**Based on the facts alleged in this complaint,** Plaintiff Mr. Napier is entitled to attorney fees under all applicable laws.

**WHEREFORE**, Mr. Napier prays for a trial by jury of twelve and judgment against Defendants as follows:

• That process issue and service be had on each Defendant;

• That judgment be granted in favor of the Plaintiff against the Defendants, jointly and severally, for the injuries of Plaintiff;

- That Plaintiff recover compensatory damages including pain and suffering, lost income and future lost income, and other expenses in an amount to be determined at trial, including attorney fees;

- That Plaintiff recover punitive damages and special damages;

- Plaintiff be awarded damages for his loss earnings and reduction in his earning capacity from Defendants;

- That Plaintiff recover costs of this litigation;

- That a jury trial be had on all issues so triable;

- That Plaintiff have Judgement against Defendants for declaratory and injunctive relief;

- That Plaintiff have Judgment against Defendants for punitive damages; and

- That Plaintiff receives such other and further relief as the Court deems just and proper.

Respectfully submitted this 11th day of March 2021.


/s/ Maria-Vittoria Carminati
Maria-Vittoria Carminati (CO #50579)

**NDH LLC**
1312 17th Street, Unit 2010
Denver, CO 80202
404-254-0442/404-935-9391 FAX
Maria-Vittoria Carminati (CO #50579)
mvcarminati@ndh-law.com