IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00746-RMR-MEH

DUSTIN NAPIER,

     Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS FOR LARIMER COUNTY,
JUSTIN SMITH, Sheriff of Larimer County, in his individual and official capacities,
CAPTAIN TIMOTHY PALMER,
JOHN DOES 1-2,
LUKE ALBROOK,
KEITH MCLAUGHLIN, M.D.,
CHARLES DAVIS, M.D.,
HANNAH HOLIDAY, A.R.N.P.,
MICHELLE WILSON, M.A.,
NURSE SUZANNE MONDANI,
NURSE LYNN SCHULTZ, AND
ARMOR CORRECTIONAL HEALTH SERVICES, INC.

     Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

     Plaintiff Dustin Napier ("Plaintiff") was a pre-trial detainee at the Larimer County Jail ("LCJ") from March 12 to March 23, 2020. He brings this lawsuit pursuant to 42 U.S.C. § 1983, claiming deliberate indifference to a serious risk of harm and deliberate indifference to his medical needs in violation of his Fourteenth Amendment right to due process. There are currently two pending motions to dismiss: (1) ECF 56 filed by Sheriff Justin Smith, Captain Timothy Palmer, Officer Luke Albrook, and the Board of County Commissioners for the County of Larimer ("BOCC") (collectively, "Larimer County Defendants"); and (2) ECF 58 filed by Dr. Keith

McLaughlin, Dr. Charles Davis, Advanced Nurse Hannah Holiday, Medical Assistant Michelle Wilson, Nurse Lynn Schultz, Nurse Suzanne Mondani, and Armor Correctional Health Services, Inc. ("Armor") (collectively "Armor Defendants"). This matter is fully briefed and has been referred to this Court for recommendation. ECF 29; ECF 63-64; ECF 67; ECF 69. The Court finds that oral argument will not materially assist in its adjudication. Based upon the record herein and for the reasons set forth below, the Court respectfully recommends that the Motions be granted in part and denied in part.

## BACKGROUND

For purposes of this ruling, the Court accepts as true the factual allegations—as opposed to any legal conclusions, bare assertions, or conclusory allegations—that Plaintiff raises in his Second Amended Complaint ("SAC"). *See generally Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

### I.      Plaintiff's Initial Arrest and Housing Placement

During a firearms background check, Plaintiff discovered he had an outstanding warrant for his arrest based on a five-year-old misdemeanor harassment charge. ECF 54-1, ¶ 29. Shortly thereafter, Plaintiff was arrested and taken into custody. *Id.* ¶ 28. On March 12, 2020, Plaintiff was booked into LCJ for the harassment charge, his first and only offense. *Id.* ¶¶ 28-29.

Upon arrival, LCJ staff took Plaintiff's fingerprints and administered a medical exam. *Id.* ¶ 30. Typically, LCJ staff would run a background check on an inmate, evaluate the inmate for housing classification, and assign the inmate a housing classification as part of the intake process. *Id.* ¶¶ 22-24, 30. These procedures are detailed in the Larimer County Sheriff's Office policy manual. *Id.* ¶ 21. The policy exists "to provide for [inmate's] welfare" and to ensure the security of the facility. *Id.* ¶ 22. To meet this end, the policy requires that an inmate be classified into specific "custody levels" based on that inmate's behavior, current charges, and criminal history,

among other factors. *Id.* ¶¶ 22-23. The inmate is then assigned a housing classification based on his or her custody level, such as general population, protective custody, and maximum security. *Id.* ¶ 24.

John Doe 2, a correctional officer responsible for assigning housing classifications, neither evaluated Plaintiff for housing classification purposes nor assigned him to a housing classification level. *Id.* ¶¶ 31-32. Had John Doe 2 evaluated Plaintiff, he would have classified Plaintiff as a low threat based on his lack of criminal history. *Id.* ¶ 33. Plaintiff alleges a link between the failure to classify him and his cell assignment with another inmate, Alex Tovar ("Tovar"). *Id.* ¶ 37.

Tovar's lengthy criminal record spans thirteen years. *Id.* ¶ 38. Notably, Tovar had been arrested for numerous charges of assault, one of which occurred while Tovar was incarcerated. *Id.* John Doe 1, another correctional officer responsible for assigning housing classification, failed to evaluate Tovar's custody level factors or to assign him a housing classification level. *Id.* ¶ 40. Plaintiff alleges that had Tovar been evaluated, he would have been classified as a maximum security inmate and housed in maximum security housing. *Id.* ¶ 39. According to the classification policy, maximum security inmates are inmates who "present a threat to the safety of staff and the facility." *Id.* ¶¶ 25, 27.

## II.   Tovar Attacks Plaintiff

Within days of being housed together, Plaintiff knew that Tovar placed him in danger. *Id.* ¶55. Several of Tovar's comments and gestures made Plaintiff fear for his life. *Id.* ¶ 56. During five separate recreational breaks, Plaintiff told Officer Albrook that being housed with Tovar placed his life in danger. *Id.* ¶¶ 55-59. He explained that Tovar might physically harm him and asked to be reassigned to a different cell with a different cellmate. *Id.* ¶ 58. Officer Albrook

responded by telling Plaintiff that it was "too much of a hassle" to reassign him because other inmates would want to be reassigned as well. *Id.* ¶ 60.

Officer Albrook had the authority to at least initiate a cell reassignment. *Id.* ¶¶ 63-65. In addition to the initial housing classification procedure, a protective custody policy permits LCJ staff to separate inmates through a "facility-initiated separation" in response to staff concerns, physical altercations, threats, or inmate behavior. *Id.* ¶¶ 26, 63. This policy provides that inmates may be housed in segregation housing when a "threat or a perceived threat to the inmate's safety" exists and no reasonable alternative is available. *Id.* ¶ 63. Together with the Housing Classification Policy, these procedures seem to imply that requests for facility-initiated separation are referred to and completed by the shift supervisor. *Id.* ¶ 27. Plaintiff alleges that his request to be reassigned to a different cell, coupled with Tovar's threats, triggered a duty for Officer Albrook to assess whether Plaintiff should have been placed in protective custody. *Id.* ¶¶ 64-65. This assessment would necessarily involve evaluating Plaintiff's and Tovar's risk factors. *Id.* ¶ 64-65. Despite this duty, neither officer assessed whether Tovar's threats warranted reassigning Plaintiff into segregation housing or informed him of alternative channels to request a reassignment. *Id.* ¶¶ 62, 64-67.

On the morning of March 19, Tovar again threatened Plaintiff. *Id.* ¶ 70-72. A few minutes later, Tovar approached Plaintiff from behind. *Id.* ¶ 73. Tovar began choking and punching him repeatedly. *Id.* ¶¶ 73-74. Plaintiff fell into the fetal position to protect himself, but Tovar kept punching him. *Id.* ¶¶ 74, 76. Because of the design of the cell doors, the only means for Plaintiff to call for help was through the cell's intercom system. *Id.* ¶¶ 52-54, 75. Plaintiff left his head exposed for several crucial seconds to reach the intercom system, allowing Tovar to punch him in the jaw. *Id.* ¶¶ 75-76. This last punch split Plaintiff's gum in the front of his mouth, leaving his

jawbone visible. *Id.* ¶¶ 77, 82. Before LCJ staff responded to the intercom, Tovar told Plaintiff to say that he buzzed the intercom to request more toilet paper or he would kill him. *Id.* ¶ 79. Plaintiff complied. *Id.* ¶ 79.

### III.   The LCJ Medical Care

Sometime after the attack, Plaintiff approached LCJ staff. *Id.* ¶ 80. Officer Albrook called medical staff to assess his injuries after seeing his profuse bleeding. *Id.* ¶¶ 80-81. The medical staff, employed by Armor, documented the injury before an officer brought Plaintiff to Poudre Valley Hospital (UC Health). *Id.* ¶¶ 81, 83-84. Hospital staff administered a CAT-scan and determined that Plaintiff suffered a fractured jawbone. *Id.* ¶¶ 86-87. It is unknown what treatment, if any, the hospital provided for the bleeding.

The hospital physician prescribed Plaintiff hydrocodone-acetaminophen, an opioid pain medication, every six hours and noted that a "maxillofacial surgery consultation [was] required" within two days. *Id.* ¶¶ 88-89. Apparently, hospital staff never told Plaintiff about the prescription or that a surgical consultation was required within two days. *Id.* ¶¶ 91-92, 94. Instead, the discharge information was given to the LCJ officer who ultimately conveyed it to the medical staff at LCJ. *Id.* ¶¶ 91-92, 94. Nurse Mondani noted in Plaintiff's medical record that he needed surgery and included information for an otolaryngology specialist. *Id.* ¶¶ 95, 97. She spoke to Dr. Davis about Plaintiff's condition around that same time. *Id.* ¶ 96. Plaintiff believes that Nurse Mondani also consulted with Dr. McLaughlin about his condition. *Id.* ¶ 105 Neither Dr. Davis nor Dr. McLaughlin began the process of scheduling a surgical consult that night, or at any point while Plaintiff was at LCJ. *Id.* ¶¶ 100, 107.

Upon returning to LCJ, Plaintiff was housed in a protective custody cell. *Id.* ¶ 98. He alleges that he did not receive any pain medication; could not eat, sleep, or lay down; and

"continuously … swallow[ed] his own blood" for four days until his release from jail. *Id.* ¶ 128. During these four days, Nurse Schultz and Nurse Mondani observed his excruciating pain but did not provide any appropriate pain medication. *Id.* ¶¶ 113-15. In response to Plaintiff's inability to eat, Nurse Mondani requested from Dr. McLaughlin that a vitamin drink, Ensure, be added to his diet. *Id.* ¶ 105. Advanced Nurse Holiday also placed him on an antibiotic. *Id.* ¶ 102. This was the extent of Plaintiff's medical care.

The morning after Plaintiff's injury, Advanced Nurse Holiday reviewed his medical records and noted that he should receive a surgical consult in two days. *Id.* ¶ 102. Later that day, Medical Assistant Wilson reviewed Plaintiff's medical records and informed him that he needed surgery. *Id.* ¶ 109-11. She gave him a list of physicians to consult after his release from jail. *Id.* ¶ 110. At this time Plaintiff still did not know that he needed a surgical consult within two days of his fracture. *Id.* ¶ 118.

Contrary to Plaintiff's account of their conversation, Medical Assistant Wilson noted in the medical records that she did advise him to see a surgeon within two days of his injury. *Id.* ¶ 111. According to her account, Plaintiff agreed to wait until after he bonded out to receive surgery so he could choose a physician closer to his home. *Id.* She indicated that if Plaintiff did not bond out when he expected, she would then schedule the off-site surgical consult. *Id.*

Plaintiff was released from LCJ on March 23 and, the following day, obtained private surgical care for his injury. *Id.* ¶ 133. He suffered permanent nerve damage in his jaw because he did not receive the surgical consult within two days after his injury, resulting in continued pain and difficulty chewing and swallowing. *Id.* ¶137-39. He alleges that his medical care was delayed to the point of being effectively denied in an attempt by the BOCC, Sherriff Smith, and Armor to lower costs of off-site medical care. *Id.* ¶¶ 140-158.

## LEGAL STANDARD

### I.      Fed. R. Civ. P. 12(b)(6)

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. *Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679–80. Second, a court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, then the claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements

of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*. (quotation marks and citation omitted).

## II.   Qualified Immunity

Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly violative at the time of the official's actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is an entitlement not to stand trial or face the other burdens of litigation. *Ahmed v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted). The privilege is an immunity from suit rather than a mere defense to liability. *Id.* Overcoming qualified immunity requires the plaintiff to show that "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Smart v. City of Wichita*, 951 F.3d 1161, 1169 (10th Cir. 2020). The Supreme Court in *Pearson v. Callahan* emphasized that courts have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of

the circumstances in the particular case at hand." 555 U.S. 223, 236 (2009); *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

## III.    Deliberate Indifference

The Fourteenth Amendment of the United States Constitution sets the standards and obligations for the treatment of pre-trial detainees and the conditions of their incarceration. *Olson v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) ("Although '[p]retrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, … this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." (quoting *Lopez v. Lemaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999), *abrogated in part on other grounds by Brown v. Flowers*, 974 F.3d 1178, 1182 (10th Cir. 2020))). There are several different manifestations of this obligation. One such manifestation is inmate safety. A jail official violates a detainee's Fourteenth Amendment right if he or she acts deliberately indifferent to a risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003). Another manifestation is inmate health. A jail official violates a detainee's Fourteenth Amendment right by acting deliberately indifferent to a detainee's serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). A third manifestation is when a jail official acts deliberately indifferent to a detainee's needs in a supervisory capacity. *Dodds v. Richardson*, 614 F.3d 1185, 1195-96 (10th Cir. 2010). A fourth manifestation is when a municipality acts deliberately indifferent to a detainee's needs pursuant to law or policy. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). Generally, all these manifestations share the same basic elements: an objective and a subjective component.

### A.      Objective Component

The objective component is met if "the harm suffered is sufficiently serious to implicate the Cruel and Unusual Punishment Clause." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). Its purpose is to limit claims to significant, as opposed to trivial, suffering. *Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014); *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005).

### B.      Subjective Component

To prevail on the subjective component, an inmate must show that the defendant knew of a substantial risk of harm but still disregarded that risk by taking no reasonable measures to abate it. *Spradley v. LeFlore Cnty. Det. Ctr.*, 764 F. App'x 692, 699 (10th Cir. 2019). The Supreme Court has held that "a prison official must have a sufficiently culpable state of mind" to violate the Fourteenth Amendment. *Farmer*, 511 U.S. at 834. A jail official cannot be found liable under the Fourteenth Amendment for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

### ANALYSIS

### I.      Initial and Continuing Housing Assignment

Plaintiff's first claims for relief concern whether the Larimer County Defendants acted deliberately indifferent through their involvement in Plaintiff's housing placement with Tovar. The Court begins by considering the conduct by the individual defendants more directly involved—John Does and Officer Albrook.

10

A.      **Individual Defendants**

Plaintiff contends that the John Doe Defendants failed to protect him from a serious risk of harm by not assessing the housing classification level for either Plaintiff or Tovar, resulting in their placement in the same cell. Plaintiff also alleges that Officer Albrook acted with deliberate indifference when he refused to reassign him to a different cell. Defendants raise qualified immunity as a defense.

Jail officials have a duty to protect pre-trial detainees from violence at the hands of other detainees. *Farmer*, 511 U.S. at 833. However, deliberate indifference "requires more than a showing of simple or heightened negligence." *Verdecia*, 327 F.3d at 1175. To establish a cognizable deliberate indifference claim for failure to protect from a known risk of harm, a plaintiff "'must show that he is incarcerated under conditions posing a substantial risk of serious harm,' the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component." *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001) (quoting *Farmer*, 511 U.S. at 834).

To satisfy the subjective component, "[a]n inmate 'need not show that a [jail] official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Smith v. Freil*, F. App'x 580, 582 (10th Cir 2006) (quoting *Farmer*, 511 U.S. at 834). The subjective component may be met by demonstrating that the jail official was aware of an obvious, substantial risk to an inmate's safety even if the official was not aware that the plaintiff would be assaulted by the specific detainee who eventually committed the assault. *Id.* (quoting *Farmer*, 511 U.S. at 842).

No Defendant contests that Plaintiff has satisfied the objective component. Further, this Court assumes as true that Tovar's criminal history, as well as his threats and gestures towards

Plaintiff, were factors that could have called Plaintiff's safety into question. It is therefore plausible that Plaintiff faced a sufficiently dangerous risk of harm to satisfy the objective component of the cause of action. The dispositive issues are then whether Defendants knew of the risk of harm and deliberately disregarded that risk of harm, and whether the right was clearly established at the time of the offense.

### 1. John Does 1 & 2

The Court first considers whether Plaintiff has pleaded a constitutional violation against Defendants John Doe 1 and 2. At the outset, the Court notes that these Defendants have not been named or served, and they do not have an attorney formally representing them. The Larimer County Defendants' motion to dismiss does not claim to make arguments on their behalf. ECF 56 at 1. Nonetheless, Larimer County Defendants present arguments as to why John Does' conduct was not unconstitutional. This Court will consider these arguments because they materially relate to later issues, but it does so without making any dispositive ruling on them.

Larimer County Defendants argue that John Does did not have the requisite knowledge of the risk of harm posed by housing Plaintiff and Tovar together because they did not apply the housing classification policy. The most direct way that John Does could have been aware of a risk of harm was by actually viewing Tovar and Plaintiff's respective criminal histories.

Plaintiff alleges that John Does 1 and 2 either misapplied or ignored the classification policy. ECF 54-1 ¶¶ 40-41. A part of the classification policy involved determining detainees' risk levels by considering, among other factors, prior criminal history. *Id.* ¶ 23. Plaintiff pleads that "Defendant's failed to perform a risk assessment as required by their own guidelines." *Id.* ¶ 19. Even so, John Does could potentially still have seen Tovar's criminal history without conducting any risk assessment. Yet, Plaintiff only pleads that LCJ correctional officers had the *opportunity*

to run a background check during the intake process—not that the officers actually did so. *Id.* ¶ 30. As framed, the SAC does not suggest that John Does had any actual knowledge of either Tovar or Plaintiff's respective criminal histories.

On the other hand, John Does may have been aware of the classification policy and the risks associated with ignoring it. Generally, "a failure to adhere to administrative regulations does not equate to a constitutional violation." *Hovater v. Robinson*, 1 F.3d 1063, 1068, n.4 (10th Cir. 1993) (citing *Davis v. Scherer*, 468 U.S. 168, 194 (1984)). However, in the context of policies that are enacted to prevent a specific harm, a court may infer that officers were aware of a risk of harm that a policy sought to prevent if the officers have knowledge of the policy and knowledge of the policy's rationale. *Hostetler v. Green,* 323 F. App'x 653, 658 (10th Cir. 2009).

Based on the pleadings, the Court assumes that John Does knew about the classification policy. Plaintiff's primary contention is that the policy was either misapplied or ignored, both of which suggest that John Does knew about the policy generally. John Does' roles within the facility and their responsibility for the application of the classification policy add additional support to the inference that John Does knew about the classification policy.

Whether John Does knew about the policy's rationale requires closer scrutiny. The Court is careful not to impute knowledge to John Does, but it may infer a defendant's knowledge from circumstantial evidence. *Farmer*, 511 U.S. at 842. The well-pleaded facts establish that the policy's rationale, "to provide for the welfare and overall security of the facility," was clearly written. ECF 54-1 ¶ 22. Additionally, the rationale was evident on the policy's face. *See Hostetler*, 323 F. App'x at 658 (citing *Goka v. Bobbitt*, 862 F.2d 646, 652 (7th Cir. 1988)). The Court also finds relevant that the policy rationale is clearly aimed at preventing the exact harm that occurred

here, that is inmate on inmate violence. The Court can infer from these pleadings that John Does knew the housing classification policy's rationale.

The Court also finds persuasive *Hostetler v. Drewery*. CIV-05-253-FHS, 2008 WL 474385 (E.D. Okla. Feb. 19, 2008), *aff'd in part*, 323 F. App'x 653 (10th Cir. 2008). In that case, a jail official allowed an inmate and the male trusty to remain alone in the plaintiff's cell for ten minutes in violation of the jail policy. *Id.* at *1-2. During that time, the male trusty sexually assaulted the inmate. *Id.* The court held that because the jail official was aware of the jail policy of not allowing male inmates access to the female inmates' cells, and aware that the rationale for the policy was to protect the female inmates from sexual assaults, these facts suggested that the defendant had knowledge of a risk of harm. *Id.* at *3. On appeal, the Tenth Circuit affirmed, holding that if a corrections officer has knowledge of the policy and its rationale, and if there is a connection between the harm that the policy existed to prevent and the harm suffered, this may support an inference that a defendant possessed subjective knowledge of the risk of harm that the policy aimed to prevent. 323 F. App'x at 658.

Similarly here, Plaintiff has pleaded that John Does knew about the policy and the harm it sought to prevent. This plausibly suggests that John Does were aware of the risk of harm associated with ignoring the housing classification policy. By ignoring the housing classification policy, John Does disregarded that risk of harm with the required degree of culpability to support a deliberate indifference claim at this stage in the litigation.

The Court next considers whether the law was clearly established at the time of the alleged violation. This inquiry "must be undertaken in the light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). While "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

violates the right," this does not require that "the very action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Instead, it requires that the unlawfulness is apparent in light of the pre-existing law. *Id.* The Tenth Circuit will look at a number of cases in combination to determine whether a right is clearly established; a single case need not stand for the right a plaintiff claims is clearly established and the court may rely on general statements of law. *Lance v. Morris*, 985 F.3d 787, 799-800 (10th Cir. 2021) (taking five cases in combination that, when taken together, clearly established a constitutional right).

Plaintiff, as a pretrial detainee, asserts a right arising from the Fourteenth Amendment Due Process Clause. In determining whether the right was clearly established under the Fourteenth Amendment, courts apply an analysis identical to that applied in Eighth Amendment cases brought under section 1983. *Lopez*, 172 F.3d at 759 n.2. In 2020, when the alleged infraction took place, it was well established by both Supreme Court and Tenth Circuit law that an inmate has a right to be protected against prison guards taking actions that are deliberately indifferent to a threat of violence from other inmates.

In *Ramos v. Lamm*, inmates were subject to threats and assaults, in part because the prison officials were not able to adequately monitor the inmates. 639 F.2d 559, 573-74 (10th Cir. 1980). The Tenth Circuit held that "an inmate does have a right to be reasonably protected from constant threats of violence and sexual assaults from other inmates." *Id.* at 572. In *Bloom v. Pompa*, a jail official housed an inmate with another inmate who was known to be violent as a punishment for prior behavior. 654 F. App'x 930, 932 (10th Cir. 2016). The court held that the jail official, in so doing, disregarded a serious risk to the inmate's safety. *Id.* at 935. These cases, taken together, clearly establish that an inmate has the right to be free from jail official's deliberate indifference to his being housed with a violent inmate that creates a known risk of harm. The Court finds

additional persuasive support in *Roemer v. Carochi*. No. 14-cv-01655-PAB-NYM, 2015 WL 5728769 (D. Colo. Sept. 29, 2015). In that case, a non-violent inmate was housed with a violent inmate who had been recommended by another agency to be in segregated housing, but the prison housing staff placed him in general population. *Id.* at *3-5. The violent inmate ultimately killed his non-violent cellmate. *Id.* at *5. The court found that it was clearly established at the time that subjecting an inmate to an unreasonable risk of violence by inadequately housing inmates together violated the Constitution. Similarly here, it was clearly established that disregarding a risk of harm resulting from housing violent and non-violent inmates together violates the constitution. However, this Court again notes that the above discussion of the matter does not constitute a ruling because John Does have not appeared to make the argument on their own behalf. Plaintiff must begin the process of identifying John Does 1 and 2, naming them, and serving them with process. *See Mansoori v. Lappin*, No. 04-3241 JAR, 2005 WL 2387599, at *6 (D. Kan. Sept. 21, 2005) ("[A]n action may proceed against unknown defendants when plaintiff provides enough information to locate and eventually serve the appropriate defendants.").

## 2.    Officer Albrook

Plaintiff next argues that Officer Albrook acted with deliberate indifference by failing to reassign him after he voiced his safety concerns. Officer Albrook argues that he could not have been personally aware of the risk Tovar presented to Plaintiff because there was no classification information—including criminal history—available for him to view. This argument finds support in the SAC. It makes no allegation Officer Albrook was involved in Plaintiff's initial housing classification. Further, Plaintiff pleads that after he requested to be relocated, Officer Albrook "took no steps to even investigate whether [Plaintiff] should be placed in protective custody." ECF

No. 54-1, ¶ 67. Based on these pleadings, it is reasonable to conclude that Albrook never viewed Tovar's criminal history.

Even so, Plaintiff pleads that he told Albrook on five separate occasions Tovar was dangerous, would physically harm him, and he did not feel safe. *Id.* ¶¶ 58-59. Officer Albrook, relying on *Turner v. Okla. Bd. of Cnty. Comm'rs*, 804 F. App'x 921 (10th Cir. 2020), argues that these statements were too general to give him notice of the specific risk of harm that Plaintiff faced. In *Turner*, a prison official witnessed an altercation and a death threat from one inmate to another. *Id.* at 926. The fighting ceased between the two inmates when the official banged on the window from his station. *Id.* at 923. Shortly after the fight, the inmate that had made the threat created a knife in his cell and subsequently stabbed the other inmate. *Id.* at 923-24. The court first found that the official was aware of a risk of harm, but that risk of harm had come to an end when the two inmate's ceased fighting. *Id.* at 926. As to the threats of future harm, the Court held that "subjective awareness of only some risk of harm to a prisoner" was insufficient to establish a deliberate indifference claim, and instead the "officials must possess enough details about a threat to enable them to conclude it presents a strong likelihood of injury." *Id.* (emphasis omitted) (quoting *Marbury v. Warden*, 936 F.3d 1227, 1236, 1238 (11th Cir. 2019)). Because the officer did not know how or why the inmate would attack and the threatened inmate did not request to be moved to a different cell, the court reasoned that the officer lacked the requisite personal knowledge of a risk of harm. *Id.*

Here, in comparison, Plaintiff requested to be moved to a different cell on five separate occasions. Plaintiff specifically described why he felt at risk (because Tovar is dangerous) and how he would be harmed (by physical attack). Additionally, the harm occurred contemporaneously with Plaintiff's requests for help in the way Plaintiff described to Officer Albrook. These facts are

more akin to *Letterman v. Roy*, No. 20-3138-JWB, 2021 WL 1056504 (D. Kan. Mar. 19, 2021). There the court noted that it was "obvious that the corrections officers had an actual knowledge of a potential risk of harm" after the plaintiff complained several times that he feared his cellmate was going to attack him. No. 20-3138-JWB, 2021 WL 1056504, at *5 (D. Kan. Mar. 19, 2021). Likewise, Plaintiff pleads Officer Albrook's actual knowledge of a potential risk of harm.

Furthermore, Plaintiff pleads that Officer Albrook disregarded this known risk of harm with the required degree of culpability. Despite having sufficient information about the risk to Plaintiff, Officer Albrook allegedly took no action in response. Thus, Plaintiff has adequately pleaded a constitutional violation at this stage in the litigation.

This Court finds that the right to be free from jail official's deliberate indifference to a known risk of inmate violence was well established at the time of the offense, as previously discussed. The Court recommends that the Motion to Dismiss be denied as to Count V.

### B.   Supervisory Defendants

Plaintiff asserts supervisory liability claims against Sheriff Smith and Captain Palmer. Importantly, "a supervisory relationship alone is insufficient for liability under § 1983." *Poolaw v. Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009) (citing *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008)). Instead, like all deliberate indifference claims, a plaintiff must show a supervisor's personal involvement through deliberate and intentional acts that "caused or contributed to the . . . violation." *Jenkins v. Wood*, 81 F.3d 988, 994-95 (10th Cir. 1996). In sum, there are three elements a plaintiff must plead: (1) personal involvement; (2) a sufficient causal connection; and (3) the requisite culpable state of mind. *Dodds*, 614 F.3d at 1195. A plaintiff can establish the defendant's personal involvement through his "personal participation, his exercise of control or direction, . . . his failure to supervise," or his promulgation, creation, implementation,

18

or utilization of a policy that caused the constitutional deprivation at issue. *Id.* (quoting *Green v. Branson*, 108 F.3d 988, 995 (10th Cir. 1997)).

Plaintiff argues that these Defendants were personally involved in the constitutional violation through their alleged failure to implement the housing classification policy and improper employee training. Turning first to the policy implementation, Plaintiff alleges LCJ correctional officers often did not apply the housing classification policy, but Sheriff Smith and Captain Palmer never held them accountable. He contends that this amounts to a custom of random housing assignments. However, this claim is not supported by the SAC. Plaintiff acknowledges that Sheriff Smith and Captain Palmer assigned staff to apply the housing classification policy—the claim against the John Doe Defendants was based on their duty to apply it. This suggests that procedures existed to implement the policy. Further, even if Sheriff Smith and Captain Palmer failed to hold the LCJ staff accountable when they inadequately applied the policy, there are no non-conclusory statements suggesting that they were ever aware that some employees were not applying it. Plaintiff has not adequately pleaded that Defendants personally participated in any constitutional violation.

Plaintiff also argues that Defendants did not adequately train their employees. To prevail under this claim, Plaintiff must plead Defendants' personal awareness of a deficiency in training, either because the need for more or different training was so obvious and likely to result in a constitutional violation that the Court may infer Defendants' knowledge, or because Defendants were made aware of deficiencies through, for example, prior constitutional violations. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). Regardless of how Plaintiff frames the deficiency in training, it amounts to only a conclusory statement regarding the housing classification training. Indeed, Plaintiff does not discuss employee training other than the conclusory statement that

officers were not trained properly. ECF 54-1, ¶¶ 42-45, 183. This Court cannot find that the SAC sufficiently demonstrates Defendants' personal involvement, a causal connection, or the requisite state of mind.

The Court recommends that the Motion to Dismiss be granted as to Count IV.

## C.      Municipal Defendants

Plaintiff asserts a municipal liability claim against Sheriff Smith and the BOCC pursuant to 42 U.S.C. § 1983 for their involvement in his housing placement. "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986)). This type of liability may attach to private actors, but they "'cannot be held liable solely because it employs a tortfeasor—or, in other words, . . . cannot be held liable under § 1983 on a respondeat superior theory.'" *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)). Instead,

> [m]unicipal liability may be based on a formal regulation or policy statement, or it may be based on an informal "custom" so long as this custom amounts to "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'"

*Brammer-Hoelter*, 602 F.3d at 1189 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). In other words, "[t]o be liable, the municipality must have had an official municipal policy of some nature that was the direct cause or moving force behind the constitutional violations." *Dubbs*, 336 F.3d at 1215 (internal citations and quotation marks omitted).

Plaintiff raises two interrelated policies as the moving force behind the violation: first, an informal custom of not classifying inmates for housing purposes; and second, a policy of double-celling inmates who are not adequately monitored. Sheriff Smith and the BOCC seek dismissal because Plaintiff fails to show the existence of a custom, or alternatively because he fails to show a direct causal link between the custom or policy and the violation alleged. The Court agrees.

To adequately plead a permanent and well-settled custom, a plaintiff may suggest that "similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008). Another way to plead the existence of a custom is to use "other evidence, such as a police officers' statements attesting to the policy's existence." *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015). Regardless of the method, the relevant consideration is whether the conduct amounts to a "widespread practice." *Brammer-Hoelter*, 602 F.3d at 1189.

As support for the existence of an inadequate housing custom, Plaintiff appears to argue that there were no criteria for identifying maximum security inmates, the classification policy lacked implementation, and Sheriff Smith and the BOCC knew that the classification policy was not being implemented. However, the Court finds that none of these arguments establish the existence of an informal custom. First, Plaintiff states in his SAC that there were criteria for identifying maximum security inmates—namely if the inmate "presents a threat to the safety of staff and the facility." ECF 54-1, ¶ 27. Plaintiff further states that, had John Does seen Tovar's criminal history, he would have been classified as a maximum security inmate, suggesting that the discretion left to the LCJ staff does not undermine the maximum security inmate procedure. *Id.* ¶ 39. Second, the argument that the classification policy lacked implementation is conclusory. Plaintiff includes no examples of other instances when the classification policy was ignored. The

failure of two LCJ staff to implement the housing classification policy does not plausibly suggest that the practice is so widespread as to amount to a custom of failing to implement the policy. Lastly, Plaintiff does not include any facts to support a finding that Sheriff Smith or the BOCC knew about any custom of failing to implement the housing classification policy. Thus, Plaintiff fails to plead the existence of a custom of failing to adequately house inmates.

Plaintiff's argument that the BOCC and Sheriff Smith had a policy of inadequately monitoring double-celled inmates suffers from similar pleading deficiencies. The arrangement of the cells, the limited ability for LCJ officials to see into the cells, and the limited means of communication between the cell and the jail staff present concerns that may heighten the need for pre-cell assignment screening and classification. *Ramos*, 639 F.2d 573-74. Even so, Plaintiff has not sufficiently shown that this arrangement was the "direct cause or moving force" behind the constitutional violation. *Dubbs*, 336 F.3d at 1215. There are simply no statements suggesting that, had the jail been arranged in a different fashion, Tovar would not have attacked Plaintiff.

The lack of a causal relationship also was present in this Court's recent decision, *Franco v. City of Boulder*, 19-cv-02634-MEH, 2021 WL 857601 (D. Colo. Mar. 8, 2021). There, an officer conducted a welfare check and investigated a potential probation violation. *Id.* at *6-10. In so doing, the officer unconstitutionally searched the plaintiff's backpack. *Id.* at *16-17. The City of Boulder had failed to instruct its officers about warrantless searches during a welfare check. *Id.* at 19. In considering whether the City of Boulder was liable for improperly training its officers, this Court found that, while the plaintiff showed deficient training, there was no evidence that sufficient training would have avoided the constitutional harm, as the harm resulted from an investigation of a probation violation, and not from the welfare check. *Id.* at 19.

Plaintiff has shown a policy that may require a heightened need for monitoring. However, Plaintiff fails to show the link between the cell layout and the claimed Fourteenth Amendment violation. Instead, the constitutional violation was the result of a failure to adequately house and classify inmates. This Court can find no pleadings that show, had the jail layout been different, the attack would not have occurred. The Court recommends that Count III be dismissed.

## II.   Plaintiff's Subsequent Medical Care

Plaintiff's next claims for relief concern whether the Armor Defendants, Sheriff Smith, and the BOCC acted with deliberate indifference in their involvement in Plaintiff's medical care. The Court begins by considering Plaintiff's claims against the medical provider individuals.

### A.      Individual Defendants

Plaintiff and Defendants present competing views as to the care provided while Plaintiff was an inmate. Plaintiff argues that the Defendants acted with deliberate indifference to his serious medical needs by providing only cursory care and refusing to schedule a necessary surgery solely to save money. Plaintiff also argues that the Defendants provided inadequate pain management for the severity of his condition. Defendants, on the other hand, argue that Plaintiff's claim amounts to his disagreement with a particular course of treatment.

The deliberate indifference standard in the medical need context remains fundamentally the same as the risk of serious harm discussed previously. Accordingly, Plaintiff must satisfy both the objective and subjective components. *Callahan*, 471 F.3d at 1159.

In the medical needs context, the Tenth Circuit explains that the objective component is met if the medical condition "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata*, 427 F.3d at 751 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir.

2000)) (internal citation omitted). Defendants do not challenge whether Plaintiff has pleaded the existence of an objectively severe medical condition. Further the Court may find that Plaintiff has satisfied the objective component of the cause of action at this stage in the litigation based on the existence of a diagnosis by the Poudre Valley Hospital physician.

Consequently, the dispositive question is whether Defendants knew of a substantial risk of harm and disregarded it by taking no reasonable actions to abate it. *Spradley*, 764 F. App'x at 699. In this determination, courts must distinguish between situations of "accidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition," which will not support a claim of deliberate indifference, *Ramos*, 639 F.2d at 575, and situations in which "a medical professional completely denies care although presented with recognizable symptoms." *Self*, 439 F.3d at 1232.

### 1.    Denial of Care

Plaintiff claims that Defendants effectively denied him access to a surgical consult to save money. Defendants seek dismissal arguing that Plaintiff has merely pleaded a disagreement with a particular course of treatment. Because of the factually intensive nature of the subjective component, case law provides helpful guidance. In *Strain v. Regalado*, 977 F.3d 984, 987 (10th Cir. 2020), an inmate was suffering from alcohol withdrawal symptoms. The jail medical staff conducted an alcohol and drug withdrawal assessment and placed the inmate on seizure precautions. *Id.* During the following hours, the inmate's symptoms increased in severity. *Id.* at 988. While the medical staff adjusted the inmate's medication to address the symptoms, they did not contact a physician. *Id.* The medical staff later noticed an apparently unintentional cut on the inmate's head and a pool of blood in his cell, yet they still did not contact a physician. *Id.* The following day, medical staff observed the inmate unable to move and, after several hours, rushed

the inmate to the hospital where he was found to have suffered cardiac arrest that left him permanently disabled. *Id.*

The court held that the medical staff did not act deliberately indifferent to the inmate's medical needs. *Id.* at 997. Critically, the court found that the medical staff diagnosed the inmate with less severe alcohol withdrawal and attempted to treated him with the appropriate level of care for the diagnosis, including medication, assessments, and monitoring. *Id.* at 994-96. Based on these facts, the court reasoned that the inmate's claim amounted to, at most, negligent diagnosis and care. *Id.*

On the other end of the spectrum, in *Al-Turki v. Robinson* a prison nurse ignored an inmate's abdominal pain. 762 F.3d at 1191. The pain was so severe that the inmate collapsed, vomited, and lost consciousness at times. *Id.* An officer visited the nurse twice requesting medical attention, but the nurse refused to care for the inmate because "it was too late" in the evening. *Id.* The following morning, the inmate passed two kidney stones. *Id.* at 1192. The court held that the nurse acted with deliberate indifference when she knew about the inmate's significant pain and chose to ignore his request for medical treatment. *Id.* at 1194.

Plaintiff's situation presents facts in between these two situations. On the one hand, Plaintiff was not entirely ignored. The pleadings suggest that Armor medical staff provided some medication and they actively monitored Plaintiff. On the other hand, this is not the situation in which medical staff simply misdiagnosed Plaintiff or provided him with negligent care. Medical staff knew Plaintiff's diagnosis and knew the next steps in treatment. More troubling, this Court can discern no medical reason for Defendants' denial of care. Defendants do not argue that their medical judgement differed from that of the outside provider. Instead, Defendants claim that Plaintiff, in intense pain and suffering, agreed to wait for treatment until he bonded out from jail

to choose a provider closer to his home. Besides its obvious inconsistency with Plaintiff's pleadings, this claim seems unlikely because Plaintiff was never made aware of the outside physician's diagnosis and instruction to receive a surgical consult within two days. Viewing the pleadings in the light most favorable to Plaintiff, as the Court must, Defendants simply advised Plaintiff to obtain medical care after his release.

Other case law provides persuasive examples of what can satisfy the subjective component in this setting. In *Watson v. GEO Corp.*, a physician recommended surgery to alleviate an inmate's pain from mild cervical spondylosis. No. CIV-07-1320-C, 2009 WL 223368, at *5 (W.D. Okla. Jan. 29, 2009). Medical staff provided several medications but did not schedule the recommended surgery to save on costs. *Id.* The court noted that the Constitution permits officials to consider costs in determining a course of treatment, but the care provided must still be adequate. *Id.* at *6. The court further clarified that treatment cannot be based solely "on pecuniary considerations rather than anyone's medical judgement." *Id.* Because the care provided amounted to "token attempts to provide subpar treatment solely to save money," the medical staff acted with deliberate indifference. *Id.* In *Bush v. Doe*, an inmate was denied Hepatitis C treatment because of the cost of treatment. 858 F. App'x 520, 521-22 (3d Cir. 2021). The Third Circuit held that the inmate's allegation demonstrated more than a disagreement with the choice of care because cost was the principle reason he did not receive care, the treatment provided did not appropriately address the underlying medical condition, and the delay in care rendered the treatment less effective. *Id.* at 523. Lastly, the Southern District of New York found deliberate indifference when medical staff provided pain medication to an inmate but delayed a "necessary" surgery until the inmate was transferred to a different facility. *Walter v. Westchester Cnty. Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408 (S.D.N.Y. 2008).

In light of this case law, the Court finds that Plaintiff has pleaded more than a mere disagreement with the efficacy of the care provided. Plaintiff has pleaded that Defendants failed to schedule a known necessary medical treatment, not because of differing medical opinions, but to save money. Because the Defendants did not schedule the surgery, Plaintiff suffered permanent nerve damage. These facts plausibly suggest that Defendants acted with deliberate indifference.

### 2.    Pain Management

Plaintiff complains about inadequate pain relief from the time of his injury until his release from jail. He pleads that he received no pain management. Defendants argue that Plaintiff was provided with Ibuprofen and support this claim with an Exhibit attached to their Motion to Dismiss. ECF 58, Ex. A. The Exhibit suggests that Plaintiff received Ibuprofen every twelve hours. Plaintiff contends that the Court cannot consider these documents because he disputes their validity.

"[A]n inference of deliberate indifference is unwarranted" where "a doctor orders treatment consistent with the symptoms presented." *Self*, 439 F.3d at 1232. "So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." *Id.* at 1233. The Court recognizes that "generalized allegations of dissatisfaction with the prison medical team's prescribed course of treatment" cannot "satisfy the subjective aspect of a deliberate-indifference claim." *White v. Kan. Dep't of Corr.*, 617 F. App'x 901, 905 (10th Cir. 2015). Here, however, Plaintiff pleads more than a generalized dissatisfaction with the pain management provided. Plaintiff pleads that he suffered from a serious acute medical injury. A hospital doctor recognized the acute pain that Plaintiff suffered from and prescribed an opioid pain medication every six hours. Even if Defendants provided Plaintiff with Ibuprofen, Plaintiff has plausibly

suggested that this pain management was not "consistent with the symptoms provided." *Self*, 439 F.3d at 1232. Defendants knowing that Plaintiff was in pain from a significant acute injury, and knowing that the hospital doctor had recommended stronger pain medication, reasonably implies that Defendants knew that the pain management provided was inadequate. Such knowledge, coupled with a decision to ignore this risk of harm, may support a claim for deliberate indifference.

The Court now considers each Defendant's personal involvement in the care provided.

### 3.      Dr. Davis and Dr. McLaughlin

Plaintiff has pleaded sufficient facts to suggest that Dr. Davis and Dr. McLaughlin both personally knew that Plaintiff faced a serious risk of harm from his open jaw fracture. Both doctors were aware of Plaintiff's diagnosis, including an outside physician's concern for prompt treatment. Both doctors were made aware of the next steps in treatment, and nonetheless refused to provide it. Plaintiff suggests that the denial of treatment was not the result of differing medical opinions. Instead, the denial was the result of cost concerns alone. A reasonable inference may be drawn from these pleadings that Dr. Davis and Dr. McLaughlin acted with deliberate indifference towards Plaintiff's medical needs. The Court therefore recommends that the Motion to Dismiss be denied as to Dr. Davis and Dr. McLaughlin.

### 4.      Advanced Nurse Holiday and Medical Assistant Wilson

Turning to Advanced Nurse Holiday and Medical Assistant Wilson, Plaintiff has sufficiently pleaded that these Defendants also had subjective knowledge that Plaintiff faced a serious risk of harm from his open jaw fracture. These Defendants were similarly aware of Plaintiff's diagnosis, the concern for prompt medical treatment, and the next steps in treatment. Further, Plaintiff plausibly pleads that Advanced Nurse Holiday and Medical Assistant Wilson had authority to provide Plaintiff with his necessary treatment. From Advanced Nurse Holiday's

authority to prescribe an antibiotic, the Court infers that she also had the authority to schedule the surgical consult or provide pain medication. As for Medical Assistant Wilson, she noted in Plaintiff's record that she would later schedule the surgical consult if he did not bond out. It is reasonable to infer that she also had the authority to provide the kind of care that the hospital doctor directed.

The allegations that these Defendants had the authority to treat Plaintiff but refused to schedule the surgery or provide adequate pain management plausibly suggests that Advanced Nurse Holiday and Medical Assistant Wilson acted with deliberate indifference towards Plaintiff's serious medical needs. The Court recommends that the Motion to Dismiss be denied as to Advanced Nurse Holiday and Medical Assistant Wilson.

### 5.    Nurse Mondani and Nurse Schultz

Nurse Mondani and Nurse Schultz are two of the several nurses who monitored Plaintiff while he was in protective custody. Taking Plaintiff's allegations as true, there exists two pleading defects. First, Plaintiff never pleads that Nurse Schultz was aware of his diagnosis or recommended care. However, even assuming Nurse Schultz knew about his diagnosis, Plaintiff never sufficiently pleads that either nurse could have provided the surgical consult or additional pain medication. The Court infers from the nurses having to request permission to add a vitamin drink to Plaintiff's diet that neither possessed any authority to address Plaintiff's condition. Plaintiff simply does not indicate how these Defendants can be held directly responsible for treatment that they did not have the authority to provide. In other words, Plaintiff has failed to indicate a causal connection between these Defendants' conduct and the alleged constitutional violation. *Gray v. Sorrels*, 744 F. App'x 563, 568 (10th Cir. 2018). The Court recommends that the Motion to Dismiss be granted as to Nurse Mondani and Nurse Schultz.

29

### B.     Municipal Defendants

Plaintiff brings municipal liability claims against Armor, Sheriff Smith, and the BOCC under 42 U.S.C. § 1983 for their involvement in his medical care. He alleges that his denial of care was facilitated in accordance with a custom of delaying medical care to inmates under the guise of waiting until the inmates bond out, thereby effectively denying medical care to save money. Defendants argue that Plaintiff does not plead the existence of custom or policy.

### 1.     Armor

As previously stated, municipal liability may be based on an informal custom when the custom "amounts to a widespread practice" that is permanent and well settled. *Brammer-Hoelter*, 602 F.3d at 1189. To support the existence of a custom, Plaintiff alleged that Armor has a long, well-known history of denying medical care to save on costs. Plaintiff includes two statements from former Armor personnel across the country. In 2019, Carolyn Rubin, a former Armor nurse in Florida, stated that there was a "strong corporate push for the doctors not to send patients out due to money," and that Armor encouraged its personnel to keep inmates at jails as long as possible to avoid hospital costs and "pulling deputies out of jail . . . to go sit with the patient at the hospital." ECF 54-1, ¶ 147. In 2016, a former Armor nurse in New York stated that Armor cut costs for medications and other medical supplies to save money. *Id.* ¶ 148. Statements from employees can serve to establish an informal custom, even if they have limited direct relevance to whether there exists a custom *at LCJ* to do the same.

The Court finds additional support for the existence of a custom from the underlying events to this lawsuit. The Court finds particularly relevant two aspects of the care Plaintiff claims he was provided. First, as previously discussed, he has suggested that his only treatment option was to wait until he bonded out to receive the recommended surgical care. The Court cannot find a

plausible medical reason for the delay in care as Plaintiff frames it besides an attempt to save money. Second is the care that was *not* provided at the hospital. Plaintiff arrived with serious bleeding, but this bleeding was allegedly never addressed. Plaintiff's condition was severe, evidenced by his jawbone visibly breaking through his gums and the hospital physician's recommendation for swift surgical care, yet there was no surgery performed while Plaintiff was at the hospital. This may be because there was not a maxillofacial surgeon available, but it is also a reasonable to infer that the outside care would have been a substantial expense.

On the other hand, Armor's contract with the BOCC and Sheriff Smith states that Armor "would assume no responsibility for paying offsite medical costs." ECF 54-1, ¶ 154. This appears, at first glance, to undermine any custom of denying care, as Armor itself would not internalize any of these offsite costs. Instead, it appears that the BOCC and Sheriff Smith are responsible for the costs. However, the BOCC and Sheriff Smith renew Armor's contract on an annual basis, according to the SAC. It is reasonable to infer that Armor still has a financial incentive in preventing offsite medical costs, albeit indirectly. While admittedly a close call, the SAC, viewed in the light most favorable to Plaintiff, suggests that Armor has a custom of denying medical care to save costs. From the pleadings, it appears that the custom is to deny outpatient treatment unless the inmate fails to bond out.

The Court must also consider whether this alleged custom plausibly caused Plaintiff's harm with the degree of culpability required. As previously discussed, cost considerations alone generally will not violate the Constitution, so long as the treatment provided is constitutionally adequate. *Watson*, 2009 WL 223368 at *5; *Hoffer v. Fla. Dep't of Corr.*, 973 F.3d 1263 (11th Cir. 2020). Nonetheless, the Court must consider the proper scope of cost concerns in the municipal liability context. In this context, *Swan v. Physician Health Partners, Inc.*, 212 F. Supp. 3d 1000

(D. Colo. 2016), is illustrative. There, the court found that CHP, a prison medical provider, had an informal custom of denying MRI requests until other steps had been exhausted for financial reasons. *Id.* at 1009. Further, the court held that this custom plausibly supported a finding of deliberate indifference. *Id.* The court reasoned that the medical provider went beyond considering costs compared to the relative need for treatment, and instead implemented a "calculated and robust policy" to automatically and reflexively deny all MRI requests regardless of the underlying medical necessity. *Id.*

Here, the custom to delay care similarly went beyond considering cost relative to the need for treatment. Plaintiff does not plead that Armor considered the cost of his offsite surgery and sought less expensive care. Instead, Plaintiff pleads that Armor denied offsite care to shift the cost of care to the inmate after he bonded out of jail. This custom goes beyond mere cost considerations and can support a claim for municipal liability. The SAC suggests that Plaintiff would have received a surgical consult within the prescribed period absent the custom of denying care. The Court accepts that such a violation of the Fourteenth Amendment would be a "plainly obvious consequence" of a custom to deny medical care without regard to the underlying circumstances. *Olsen*, 312 F.3d at 1318. Therefore, Plaintiff has pleaded a custom of denying care that was the "moving force" behind the constitutional violation. *Bd. of Cnty. Comm'r of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). The Court recommends that the motion to dismiss be denied as to Count VI.

### 2.    Sheriff Smith and BOCC

In determining Sheriff Smith's and the BOCC's liability, the Court begins by considering whether Plaintiff has plausibly suggested the existence of a custom to deny care to save on costs. Unlike Armor, Sheriff Smith and the BOCC are further removed from the constitutional violation

alleged. Plaintiff's only support for a custom of denying medical care comes from financial incentives and the underlying facts of the case.

Plaintiff pleads that Sheriff Smith and the BOCC are responsible for the costs of offsite medical care. From this, the Court may infer that they could have a strong incentive to limit offsite medical care. Further, Plaintiff pleads a significant disparity between offsite care ($77,643 in 2018) compared to onsite medical costs ($3,591,303 in 2018). ECF 54-1, ¶ 141. Success in limiting costs, coupled with a strong incentive to limit costs, does not necessarily establish that Sheriff Smith and the BOCC have a custom of denying care. It could be true that, even taking the financial matters in the light most favorable to the Plaintiff, inmates rarely require offsite medical care. However, this Court must determine whether these facts *plausibly suggest* the existence of such a custom. Considering the facts presented in the light most favorably to Plaintiff, the Court finds that he has shown the minimal requirement to nudge the existence of a custom by Sheriff Smith and the BOCC to deny medical care to lower costs from conceivable to plausible.

A custom of denying care alone is not sufficient to establish municipal liability—Plaintiff must plead that the custom was the moving force behind the constitutional violation. For the same reasons as previously stated regarding the Armor Defendants, Plaintiff has met this pleading requirement. Plaintiff has sufficiently pleaded that this custom was the moving force behind the constitutional violation, and the resulting constitutional violation was a plain and obvious consequence to denying care. Therefore, the Court finds that, at this point in the litigation, Plaintiff has pleaded the minimal facts to nudge the existence of the custom from mere speculation or conjecture into the realm of plausibility.

### III.  State Law Claims

Defendants seek to dismiss Plaintiff's state law claims for medical malpractice against the individual Armor Defendants and respondeat superior liability against Armor arising from the alleged medical malpractice. While they argue that dismissal is warranted because all other claims should be dismissed, the Court finds that several claims, and indeed most claims against the Armor Defendants, should not be dismissed. Additionally, the state law claims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). For those reasons, the Court recommends denying the Armor Defendants' Motion to Dismiss as to Counts VII and VIII.[1]

### IV.  Leave to Amend

Dismissal of a case is a harsh remedy, and as a general rule, a litigant should have the opportunity to amend the complaint and cure pleading defects. *Hall v. Bellman*, 935 F.2d 1106, 1109–10 (10th Cir. 1991); *Reynoldson v. Shillinger*, 907 F.2d 124, 126 (10th Cir. 1990). The Court does not find that filing a Third Amended Complaint would be futile. This is the first ruling on the merits of Defendants' dismissal arguments, and there is the potential that Plaintiffs can correct for the pleading deficiencies discussed above.

### <u>CONCLUSION</u>

The Court finds that Plaintiffs do not plead certain causes of action plausibly according to their legal definitions, but there is potential that Plaintiff can cure these deficiencies. Accordingly,

---

[1] The Court notes that C.R.S. § 13-20-602(1)(a) requires a plaintiff to file a certificate of review in "every action for damages or indemnity based upon the alleged professional negligence of . . . a licensed professional." Colorado courts have held that the requirement for a certificate of review is not a jurisdictional requirement. *Miller v. Rowtech, LLC*, 3 P.3d 492, 494 (Colo. App. 2000). A defendant may request dismissal of a complaint when a plaintiff fails to include the certificate of review pursuant to Section 13-20-602(4), but Defendants have not moved to dismiss the medical malpractice claim on this basis.

for the reasons stated herein, the Court respectfully recommends that the Larimer County Defendants' Motion to Dismiss [filed September 7, 2021; ECF 56] and the Armor Defendants' Motion to Dismiss [filed September 8, 2021; ECF 58] be **granted in part**.[2] The Court recommends dismissal of Count I as against Nurse Schultz and Nurse Mondani, Count III, and Count IV on the basis of Plaintiff's failure to state a claim for relief. However, the Court recommends that the dismissals be without prejudice.

The Motions to Dismiss are otherwise **denied**.

Entered this 10th day of March, 2022 at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge

---

[2] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).